CENTRAL TRUST CO. v. RICHMOND, N., I. & B. R. CO. et al.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1895.)

No. 240.

1. MECHANIC'S LIEN—WAIVER—INCONSISTENT SECURITY.

It seems that, while the right to a mechanic's lien may be waived by the acceptance of a contract to pay for the work in securities whose existence is inconsistent with the existence of a lien, such waiver is only conditional upon the actual performance of the contract, and if it is not performed the right to the lien continues.

2. SAME—KENTUCKY STATUTE—WHEN LIEN ARISES.

The Kentucky statute relative to mechanics' liens upon railroads (Barb. & C. Ky. St. 1894, §§ 2492–2495) provides (section 2492) that "all persons who perform labor or who furnish labor, materials or teams * * * by contract * * * with the owner * * * or by subcontract thereunder, shall have a lien * * * which * * * shall be prior and superior to all other liens theretofore or thereafter created." Section 2493: "The liens * * * shall in no case be for a greater amount in the aggregate than the contract price of the original contractor and, should the aggregate * * * exceed the price agreed upon, * * * there shall be a pro rata distribution. * * *" Section 2494: "No lien shall attach unless the person who performs the labor or furnishes the labor, material or teams shall, within 60 days after the last day of the last month in which any labor was performed or material furnished, file * * * a statement * * * setting forth the amount due," etc. Held, that, under this statute, the lien originates with the beginning of the work or delivery of materials, and continues, as an incipient or inchoate lien, until perfected by filing the required notice, etc., or lost by failure to do so within the prescribed time.

3. SAME—NATURE OF SUBCONTRACTOR'S LIEN.

Held, further, that a subcontractor in the first degree is given by said statute a direct lien, independent of the lien of the principal contractor, or of a waiver or loss thereof.

4. SAME—TIME FOR FILING NOTICE.

Held, further, that the statute requires each particular contractor or subcontractor to file notice of his lien within 60 days from the end of the month in which he completes his own work, and not from the end of that in which the work of the last contractor or subcontractor engaged upon the undertaking is completed.

5. SAME—PAYMENT TO PRINCIPAL CONTRACTOR.

The R. Ry. Co. made a contract with the O. Contract Co. to build its road; payment to be made in stock and bonds deliverable from time to time, as the work progressed, upon monthly certificates of the engineer of the railway company, in proportion to the amount of work completed; the monthly estimates being subject to revision on the final settlement, at the completion of the work. This contract contained no provision for securing the railway company against liens of subcontractors, or permitting it to pay them directly. The contract company made subcontracts with various persons to do parts of the work, to be paid for in money. Held, that neither the contract with the principal contractor, nor payment to it in accordance with such contract, could affect the rights of the subcontractors to liens upon the property of the railway company.

6. SAME—APPLICATION OF PAYMENTS TO SUBCONTRACTOR.

The amount of the subcontracts made by the contract company exceeded the amount coming to it by the contract with the railway company. Payments were made from time to time by the contract company to the subcontractors, some receiving a larger proportion than others, and the payments in certain months being nearly equal to the amount due to the subcontractors, according to the engineer's estimates for such months. Held, that such payments were primarily applicable to that part of the subcontractors' claims which could not be secured by liens against the

owner's property, without regard to the proportion of lienable claims in the estimates for the particular months when the payments were made, and that the subcontractors were entitled to the full benefit of their liens until paid the whole amount due them, respectively.

**7. SAME—ASCERTAINMENT OF PRO RATA SHARES.**

*Held*, further, that, in ascertaining the amount of the pro rata shares of the contract price to which the several sub-contractors were entitled, such contract price should be apportioned according to the whole amount of their respective lienable claims, whether or not partly paid by the principal contractor, and whether or not actually perfected as liens.

**8. SAME—VALUE OF PRICE PAID IN SECURITIES.**

The bonds and stock called for by the contract with the O. Contract Co. were delivered to it, in accordance with such contract, and were sold by it, from time to time, some nearly at par value, others at very much less. *Held* that, for the purpose of determining the money value of the contract price to be paid to the O. Co., by which the liens of the sub-contractors were limited, the market value of the stock and bonds at the times when they were actually delivered to the contract company should be ascertained.

**9. SAME.**

The contract company was able, by assigning to another railway company the stock, paid to it by the R. Ry. Co., to procure the indorsement of such other railway company on some of the bonds paid to it by the R. Ry. Co., thereby enhancing their value. The stock had no value, except in the voting power attached to it as an inducement to such an arrangement. *Held*, that the enhanced value of the bonds, thus secured, might properly be included as part of the money value of the price paid the contract company, though the R. Ry. Co. had nothing to do with the arrangement for the indorsement of its bonds.

Appeal from the Circuit Court of the United States for the District of Kentucky.

This was a suit by the Central Trust Company against the Richmond, Nicholasville, Irvine & Beattyville Railroad Company and others for the foreclosure of a mortgage. Numerous parties intervened, claiming mechanics' liens on the road. Demurrers to some of such petitions were passed upon by the circuit court in a decision reported in 54 Fed. 723. The circuit court entered a final decree settling the priorities among the various claimants. The complainant appeals.

The questions for determination arise between creditors of the defendant railroad company, claiming mechanics' liens for the construction of its road, and the holders of its first mortgage bonds, issued shortly after construction was begun. The Richmond, Nicholasville, Irvine & Beattyville Railroad Company, hereafter designated and described as the "Railroad Company," was chartered by special act of the Kentucky legislature, and authorized to construct and operate a railroad from Versailles, in Woodford county, to Beattyville, in Lea county, Ky. The charter provided that the company might pay for the construction of its railroad with its own capital stock and bonds. On the 1st day of July, 1889, the railroad company executed its first mortgage to the Central Trust Company of New York, as trustee, which mortgage recited that it had executed, and made ready for delivery, 2,375 bonds, of the denomination of $1,000 each, bearing interest at the rate of 6 per cent. per annum, payable semiannually, evidenced by coupons attached, the principal being payable 30 years after date. It was also provided that upon default in the payment of interest for more than six months the principal sum mentioned in each of the said bonds should, at the option of the holders of a majority of the bonds, become due and payable. There was a default in the payment of interest for more than six months, whereupon, at the request of a majority of the holders of the bonds, the trust company declared the maturity of the prin-

cipal thereof; and this bill was thereupon filed December 2, 1891, in the circuit court of the United States for the district of Kentucky, for the purpose of obtaining a foreclosure thereof. Various persons and corporations, claiming to be creditors of the said railroad company, and claiming to be entitled to priority over the mortgage aforesaid, were made defendants thereto, and some of them have filed cross bills setting up their several claims. From the final decree of foreclosure, settling the priorities as between the various creditors, appeals have been prosecuted by the Central Trust Company, and by a large number of other creditors, claiming mechanics' liens.

On the 11th day of October, 1888, and prior to the execution of the mortgage aforesaid, the railroad company entered into a contract for the construction of its entire line of railway with the Ohio Valley Improvement & Contract Company. That company was a Kentucky corporation, authorized by its charter to construct railroads, and to receive in payment the stocks and bonds of such railroads. By the contract mentioned, the Ohio Valley Improvement & Contract Company, hereafter designated the "Contract Company," agreed to procure all necessary rights of way, to make all surveys, to furnish all the materials, and to build the entire line of said railroad, from Versailles to a point within one-half of a mile of Beattyville. It also undertook to pay to the railroad company, until the road was completed, such sums as might be necessary to pay the salaries of the railroad company's officers, not exceeding $10,000 per annum. It also agreed to assume and pay the debts of the railroad company, not exceeding $25,000, and to assume and pay the interest coupons on the mortgage bonds of the railroad company during the construction of the road, and two semiannual installments of interest thereafter maturing. In payment for all this the railroad company agreed to assign to the contract company bonds of five counties, amounting to $550,000, to be delivered to the contract company whenever the railroad company was entitled to receive the same from the counties for construction of the road in accordance with their several subscriptions. The counties had subscribed, in all, for $550,000 of stock of the railroad company, payable in bonds of the respective counties, in installments, depending upon the completion of the road to designated points. The railroad company further agreed to assign and deliver to the contract company, for each lineal mile of road, $25,000 of its own negotiable 6 per cent. coupon bonds, secured by a mortgage constituting a first lien upon the entire line of road and its equipments; also to assign to the contract company the subscriptions made by individuals to the capital stock of the railroad company; also to issue to the contract company, for each lineal mile of road, $25,000 of the paid-up capital stock of the company, after deducting the stock subscribed for by individuals and counties. It was provided in the contract that the aforesaid bonds and shares of stock should be issued in advance, and placed in the custody of the Louisville Trust Company, to be paid over to the contract company as the work progressed. The entire line of road thus contracted for was 97 miles in length. Of this, 62 miles was completed. Considerable proportion of the remainder was graded, but before completion the contract company became insolvent, and abandoned the work, whereupon this litigation began. Of the $550,000 in county bonds mentioned in the contract, only $200,000 were earned. The remainder were lost on account of the failure of the contract company to finish the road to designated points by the times stipulated in the various contracts with the counties. During the time of construction the railroad company delivered to the contract company the $200,000 of county bonds earned as aforesaid, and its first mortgage bonds to the amount of $2,375,000. It also delivered a corresponding amount of its railroad shares to said contract company. The contract company is one of the defendants to this litigation, but it has not appealed from the decree of the circuit court.

All these payments were made to the contract company on monthly estimates by the chief engineer of the railroad company, which estimates included the work done and materials furnished by the contract company, directly or through its various subcontractors; the contract providing for

payment by installments, on estimates thus made, as the work progressed. A large part of the work done and materials furnished was done or furnished directly by the contract company, but a still larger proportion was done or furnished through the medium of subcontractors employed by the principal contractor. These subcontractors were to be paid directly by the contract company in money, on monthly estimates furnished by the railroad company's chief engineer, who was to give vouchers for 90 per cent. of such estimates, to be paid in cash by the contract company. The railroad company seems to have fully complied with the terms of its own agreement, and to have made all payments, as the work progressed, which it was obligated to do. The capital of the contract company was insufficient to carry on and complete its undertaking. It was therefore driven to make ruinous sales of the securities it from time to time received under its contract, at prices affected by the fact that they were the securities of an unfinished railroad,—subordinate, by the express terms of the Kentucky statute giving a lien to contractors and subcontractors constructing a railroad, to the claims of all engaged in the work of construction. The railroad company took no steps to protect itself against the liens of subcontractors, and made no payments directly to them. It seems to have willingly met its obligations to the contract company, and to have trusted to its ability to relieve its road from any liens which might exist in favor of subcontractors. The contract company had an independent capital of about $500,000. It added to this the proceeds arising from the sale of the railroad company's securities, and applied all in the payment of its own obligations. Their resources proved insufficient. It was compelled to abandon its contract before completion, leaving several hundred thousand dollars of debts to subcontractors unpaid. The unpaid subcontractors were either made defendants to the foreclosure bill, or they have become parties by intervention, and have asserted liens, under the Kentucky lien law, as against the property of the railroad company. These claims, if successfully asserted, constitute liens prior to that of the bondholders. The property of the railroad is confessedly inadequate to meet both classes of liens. This state of facts has given rise to a much complicated and hotly-contested series of litigations, culminating in 12 distinct appeals from the decree of the circuit court. Many of the appeals present questions common to all the cases. These appeals were argued together. So many of the questions as are common to all the appeals, and as presented on the appeal of the Central Trust Company, will be disposed of in this opinion, leaving such questions as arise upon cross-appeals of mechanic's lien creditors to be disposed of in another opinion. The existence and priority of the several liens claimed in opposition to the bondholders depend upon a construction of the Kentucky lien act passed in 1888, entitled "An act to create a lien on canals, railroads, and other public improvements, in favor of persons furnishing labor or materials for the construction or improvement thereon"; being sections 2492–2495 of the Kentucky Statutes of 1894, revised by Barbour and Carroll. These sections are as follows:

"Section 1. That all persons who perform labor or who furnish labor, materials or teams for the construction or improvement in this commonwealth, by contract express or implied, with the owner or owners thereof, or by sub-contract thereunder, shall have a lien thereon and upon all the property and franchises of the owner or owners thereof for the full contract price of such labor, material and teams so furnished or performed, which said lien shall be prior and superior to all other liens theretofore or thereafter created thereon.

"Sec. 2. The liens provided for in the foregoing section shall in no case be for a greater amount in the aggregate than the contract price of the original contractor, and should the aggregate amount of liens exceed the price agreed upon between the original contractor and the owner or owners of the canal, railroad, turnpike or other improvement, then there shall be a pro rata distribution of the original contract price among said lienholders.

"Sec. 3. No lien provided for in this act shall attach unless the person who performs the labor or furnishes the labor, material or teams, shall within sixty days after the last day in the last month in which any labor was

performed, or materials or teams were furnished, file in the county clerk's office of each county in which the labor was performed or materials or teams were furnished, a statement in writing, verified by affidavit, setting forth the amount due therefor, and for which the lien is claimed, and the name of the canal, railroad or other public improvement upon which it is claimed. Said claim shall be filed and indorsed by the clerk of said court, giving the date of its filing. The clerk shall also make an abstract and entry thereof, as now provided by law in case of mechanic's liens, and in the same books used for that purpose, and shall make proper index thereof. For his services the clerk shall be paid one dollar by the party filing the claim. which may be recovered by the latter from the owner or owners of the canal, railroad or other improvements as costs.

"Sec. 4. Liens acquired under this act shall be enforced by proper proceedings in equity, to which other lien-holders shall be made parties; but such proceedings must be begun within one year from the filing of the claim in the county clerk's office, as required by the third section of this act."

A. E. Richards and J. B. Baskin, for Central Trust Co.

W. A. Sudduth and H. L. Stone, for Richmond Const. Co.

Earnest Macpherson, for John Mitchell & Co.

St. John Boyle, for Louisville Trust Co.

Matthew O'Doherty, for D. Shannahan & Co.

Humphrey & Davie, for D. Shannahan & Co. and J. W. Walker.

Pirtle & Trabue, for Dickason & Crawford.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The first question presented upon the appeal of the Central Trust Company involves the existence of a mechanic's lien in favor of any of the subcontractors. The contention of the trust company is that the contract company agreed to accept for its work, bonds constituting a first lien upon the same property, and maturing 30 years from their date, and thereby waived any mechanic's lien in its favor, and that subcontractors are bound by the waiver, and cannot assert any lien in consequence. It may be admitted that lien laws do not, in general, create a lien in favor of one who accepts in full a different security at the time the contract or agreement is made, or who has entered into any other agreement which manifestly indicates a clear purpose and intention to waive the benefit of the statutory lien. A contract for a security which is inconsistent with the intention that a mechanic's lien should exist will be held, generally, as a waiver of the statutory lien; but it is well settled that though the owner obligate himself to give a security inconsistent with the intention that a mechanic's lien should exist, or where the contract is to pay in land, or other specific article of property, yet if the owner fail to fulfill the agreement for such mode of payment, or for different security, it will not be taken as an agreement to waive the mechanic's lien in case payment is not made in the manner provided for, or the security is not given according to the obligation of the owner. Grant v. Strong, 18 Wall. 623; Reiley v. Ward, 4 G. Greene, 22; McMurray v. Brown. 91 U. S. 257. "If the labor has been performed, or the materials furnished, no matter in what the owner agreed to pay, if he has not paid in any way, the laborer or mechanic

has a right to resort to the security provided by law, unless the rights of third parties intervene before he gives the required notice. Liens of the kind, except where the statute otherwise provides, arise by the operation of law, independent of the express terms of the contract, in case the stipulated labor is performed, or the promised materials are furnished; the principle being that the parties are supposed to contract on the basis that if the stipulated labor is performed, or the promised materials are furnished, the laborer or material man is entitled to the lien which the law affords, provided hé gives the required notice within the specified time." McMurray v. Brown, 91 U. S. 266; Chicago & A. R. Co. v. Union Rolling-Mill Co., 109 U. S. 702, 721, 722, 3 Sup. Ct. 594; Van Stone v. Manufacturing Co., 142 U. S. 136, 12 Sup. Ct. 181. It may be admitted that the agreement of the contract company to accept, in payment for work and materials, the bonds of the company, secured by a first mortgage, and payable in 30 years, and the shares of the capital stock of the company, was an agreement to take a security, which, when actually accepted, would be inconsistent with the retention of a mechanic's lien. And it may be conceded that, to the extent that payment was made and accepted in bonds and shares, to that extent the debt for work and materials was satisfied, and the mechanic's lien waived. It is very clear, however, that under the Kentucky statute a lien is originated with the beginning of the work, or the delivery of the materials. The provision in the third section of the act that no lien "shall attach unless the person who performs the labor or furnishes the labor, materials, or teams, shall within sixty days after the last day of the last month in which any labor was performed, or materials or teams were furnished, furnish a statement in writing * * * and file the same with the clerk of the county court," is not in conflict with this view. This filing of the claim is necessary to the continuance and perfection of the lien. If this is not the meaning, and the lien has its inception when the work has been completed and the claim filed, then the contractor would have no protection against a bona fide purchaser who bought or fixed a lien before the statutory registration. The lien, under such statutes, has been uniformly held to begin with the delivery of materials, or the beginning of the work. It is not a lien originating in a contract for a lien, but arises out of the statute, independent of any agreement for a lien, and is based upon the equity of paying for work done or materials delivered. It is an incipient or inchoate lien until it is completed or perfected by compliance with the statute, and is lost utterly if those acts be not done, required for its completion, within the time and in the manner required by the statute. Thus, although the contract company had a contract for payment in such securities, which, when accepted, would be inconsistent with the retention of a statutory lien, yet it had an inchoate lien from the time it began work or the delivery of material, which inchoate lien was only waived when the owner complied with his agreement, and gave the security or made the payment contracted for. But, independently of the existence of an incipient or perfected lien in favor of the contract company, we are quite agreed that a subcontractor in the first degree is

given a direct lien under this statute. It is difficult, as observed by counsel, to add anything by way of argument which will make this contention any more obvious than is apparent from the plain language of the statute. The first section of the act gives the lien to "all persons who perform labor or furnish labor or materials * * * by contract express or implied with the owner * * * or by subcontract thereunder." The clear purpose of the Kentucky statute was to make the liens of the contractor and subcontractor independent direct liens, the latter limited only by the amount of the original contract price. The lien of the subcontractor does not spring out of the lien of the contractor; is not derived therefrom, or subordinate thereto. The aggregate of all the liens is not to exceed the contract price agreed to be paid by the owner, but this limitation concerns, not the fact of a lien, but the extent thereof. Being a direct lien, its existence does not depend upon the existence or nonexistence of a contractor's lien, and the waiver of a lien by a contractor will not affect the subcontractor's lien.

Opinions of other courts, construing other statutes, are of little importance, without a careful comparison of the statute in question with that construed. But upon this question, as to whether a subcontractor has a direct lien, the case of Green v. Williams, reported in 92 Tenn. 220, 21 S. W. 520, is in point, for the reason that the Tennessee statute gives a lien to the contractor, "and every person employed by the contractor to work on the building or to furnish materials." The Tennessee supreme court, in the case cited, said that the lien of a furnisher of materials, under that statute, was distinct, and independent of that of the original contractor, saying:

"The statute gives the lien to several classes of persons, and the lien of each depends upon the statute, and is not derived from the right, or dependent upon the existence or nonexistence of the lien, of any other. The contractor may, by contract or conduct, waive or estop himself. But his subcontractor may nevertheless bring himself within the protection of the statute, and independently assert a lien for his work or materials."

The language of the Kentucky act is that "all persons who perform labor or who furnish materials, by contract express or implied with the owner or owners thereof, or by sub-contract thereunder, shall have a lien thereon." As to who is meant by "sub-contractor thereunder," the learned district judge very aptly observed that:

"The words 'by sub-contract thereunder' could not be intended to make the lien of subcontractor a subrogated one, taking simply the place of the contractor, since, if such was the intention and meaning, the limitation of the liens to the original contract price would be without meaning, as, without this limitation, neither the original contractor, or those subrogated to his lien, could claim a lien for labor and material furnished under a contract, beyond the contract price of that contract. I have heretofore construed those words as limiting the person who could obtain a subcontractor's lien."

2. The contention that the lien claims registered in the county clerk's office before the final completion or abandonment of the work by the contractor or subcontractor last engaged upon the work were prematurely filed, and that, therefore, no lien has been perfected, is not based upon a reasonable construction of the statute. The act requires that a lienor "shall within sixty days after the last day of

the last month in which any labor was performed, or materials or teams were furnished, * * * furnish a statement in writing, verified by affidavit, setting forth the amount due therefor, and for which the lien is claimed: * * * Said claim shall be filed and indorsed by the clerk of the court, giving the date of its filing." By section 4 it is required that the lien thus asserted shall be enforced by a suit in equity, to which other lienors are parties, by proceedings begun within one year from the filing of the claim in the county clerk's office. In view of the limitation upon the aggregate amount of liens enforceable against an owner who has a contract for the whole work, and of the provision that if the liens exceed the contract price the original contract price shall be distributed pro rata among such lienors, it is evident that all lienors should be parties to any suit of the kind, where, by reason of the excess of liens over the contract price, a pro rata distribution must be made. Indeed, the statute expressly requires only what a court of equity, under such circumstances, would order. But this does not, in itself, conflict with the other provision, which seems to contemplate that the person doing or furnishing the labor, materials, or teams is required to file his claim within 60 days after he has completed his work or furnished his materials. The language, "due therefor, upon which the lien is claimed," refers to the statement of the labor that was performed or materials or teams that were furnished, which was the subject-matter of the statement to be filed in the county clerk's office of each county in which the labor was so performed or the materials so furnished. The word "therefor" cannot refer to the last labor that was performed, or the last materials that were furnished, by some other person. The construction placed upon the statute by the district judge, by which each claimant is required to file his claim within 60 days after the last day of the last month in which he performed any labor, or furnished any materials, meets with our approval. The inconvenience of having the final decree postponed until all lienors can be brought before the court who had subcontracts under the original contractor, is not so great as to leave purchasers and creditors indefinitely unadvised as to the existence of liens for work done and materials furnished until the last work had been done or the last materials furnished under a contract for the construction of an entire railroad. The object of filing the claim is to give notice, not only to the owner, but to others interested; and it seems very unreasonable to construe the statute so as to authorize the filing of such notice only after completion of the entire work, or a final abandonment of the contractor's obligation.

3. As we have before stated, the contract between the contract company and the railroad company obligated the latter to pay the former, as the work progressed, on monthly estimates embracing all work done or materials furnished under the contract. The railroad company did make payments accordingly, on estimates which embraced all work done and materials furnished, whether by the contract company directly, or through its subcontractors. The insistence of the appellant is that the subcontractors must be taken to have entered upon their several subcontracts with reference to the

obligation of the railroad company to pay on monthly estimates, as the work progressed, and therefore to be bound by all payments thus made under the contract. This might be so, if the subcontractors' lien was a derivative one, and subordinate to the lien of the principal contractor. When the railroad company made the contract for the construction of its entire road, it did so in the face of the fact that the contractor might sublet the work, and that, if it did so, each subcontractor would be entitled, under the law, to a lien which could only be discharged by the payment to such subcontractors of an equitable proportion of the original contract price. This statute was as much a part of the original contract as if it had been written therein. Under the plain and explicit provision of the statute, there was no way for the railroad company to protect itself against the liens of subcontractors but by so distributing the contract price between all who should contribute to the work of construction as that each incipient lienor should receive from it his pro rata of the contract price. An agreement to pay to the contractor this contract price in installments, as the work progressed, was an agreement inconsistent with self-protection. If an owner, in the face of such a statute, obligates himself to make payments in advance, or in installments, as the work progresses, he cannot complain if the effect of his own agreement is to leave him unprotected against the possible defaults of the contractor in paying subcontractors. We do not think that the effect of the statute is to suspend the owner's own contract, as to the time and mode of paying the original contractor. If he has made a foolish contract, it is nevertheless a valid one; and if he cannot get relief through an equitable injunction, in case subcontracts are made, but is forced to carry out his agreement, he has no one to blame for his own folly in making a contract prejudicial to his own interests, in case subcontractors are left unpaid. From this it must follow that payments made to the contract company, in excess of its pro rata proportion, for work and labor done or materials furnished by it, are no answer to the independent liens of subcontractors whose obligations have not been discharged by the contract company. Jones, Liens, §§ 1304, 1305. What the effect would be if the principal contractor had made payments to his subcontractors through orders made on the owner, it is unnecessary for us to say, for no such question arises in this case. Payments made by the owner direct to a subcontractor in discharge of the subcontractor's claim and lien would, of course, operate as intended by the parties, and reduce to that extent the liability of the property for mechanics' liens, provided such payments were not in excess of the pro rata part of the contract price due to such subcontractor. So, also, it may be conceded that if the subcontractor expressly or impliedly agreed that the contract price might be paid to the principal contractor, and undertook, expressly or impliedly, to look to the principal contractor alone, such conduct would operate as an estoppel, and prevent the enforcement of any lien by the subcontractor. This case is, however, free from all circumstances indicating any agreement, express or implied, that the contract price might be paid to the principal contractor, and that such payment should

operate as a discharge, pro tanto, of the subcontractor's lien. There is nothing to indicate that in any way the principal contractor received any part of the contract price as the agent of the subcontractors. The subcontractors were in the situation of a creditor having two securities. The principal contractor was primarily liable for the whole amount of their claims. In addition, they had a lien upon the owner's property for a proportionate part of each claim against the contractor. Payments made by the principal contractor to a subcontractor would primarily be payments in discharge of the personal obligation of the principal contractor, and therefore applicable to that part of the subcontractor's claim in excess of his lien against the owner. This was the rule of distribution and application of payment adopted by the district judge who heard this case in the circuit court. We have given additional consideration to the argument presented here by the Central Trust Company, that partial payments made from time to time by the principal contractor upon monthly estimates of work or materials done or furnished by the subcontractors should operate as an absolute discharge of so much of the claims of the subcontractors as was embraced within the estimate paid, in full or in part. This question arises upon evidence that monthly estimates were made by the railroad company's chief engineer of work done or materials furnished by subcontractors, and that the contractor, in very many instances, paid on such estimates 90 per cent. of the amount thus estimated. Upon these facts, counsel contend that the payments thus made by the contractor operated to absolutely discharge 90 per cent. of the entire work done and materials furnished during the given month. This overlooks the fact that the subcontractors' contracts were entire contracts. They were contracts to do so much work and furnish so much material for a given sum of money, and that these monthly payments as the work progressed were upon estimates subject to correction. The learned district judge was right in holding that payments made upon such estimates were, in the last analysis, but partial payments upon sums due or to become due upon the subcontractors' entire contracts, and that as a partial payment made by the contractor, who was personally obligated to pay the whole of the sum, it should be properly treated as a payment upon that proportion of the subcontractors' claims in excess of that secured by the lien. The same result will be brought about upon another theory, which is that, where the aggregate of the liens is for a sum in excess of the original contract price, each lienor is entitled, under the statute, to only a proportionate part of the contract price, and to a pro rata interest in the common security, and that he would be entitled, when he came to assert his claim against the common security, to obtain that pro rata upon the basis of his entire claim, and not upon the basis of the balance due after crediting his claim with payments made by the principal contractor on account of his personal liability. Bank v. Armstrong, 8 C. C. A. 155, 59 Fed. 379. Thus construed, it must follow that the distribution of the original contract price should be made upon the basis of the entire lienable claim of each subcontractor to the work of construction. If the railroad company pays out the contract price

before the work is completed or finally abandoned, then its liability to contractors or subcontractors left with unpaid claims will be ascertained by an appraisement of the entire original contract price among the several persons who did work or furnished materials on the basis of the cost of the work. To limit this distribution to those claims which were perfected by the statutory notice would be unjust to the owner, who had a right to distribute the contract price during the progress of the work. · If, by premature distribution, one incipient lienor is paid more than his proportion, the owner will suffer the loss, and be remitted to his remedy against the original contractor. To require the contract price to be distributed alone among those who finally perfected their claims, and upon the basis of the amount of the claims shown by the completed liens, would do great injustice, and deprive the owner of the right to distribute the contract price among contributors to the work as it progressed. The fact that some of the subcontractors have been paid a larger per cent. of their claims by the principal contractor than others is an advantage of which they should not be deprived. If any part of their · claims remains unpaid, they will be entitled to share in the common security ratably. That some of the subcontractors received some of the bonds paid by the railroad company to the principal contractor, and that others received the proceeds derived from sales of such bonds by the contractor, cannot affect the rule of distribution. The bonds were paid to the contract company as an absolute payment, and became the property of that company, to do with as it saw fit. The contract company was absolutely liable to each subcontractor for the full amount of the price agreed to be paid under the subcontracts. The aggregate sums thus due to subcontractors very much exceeded the original contract price. Payments made by the contract company were most often made from a common fund, arising in part from the capital of that company, and in part from proceeds of sales of bonds received from the railroad company; other payments were made on the check of the company against a fund traceable wholly to proceeds of sales of such bonds; and, in still other cases, partial payments were made in such bonds at an agreed cash valuation. But all these payments were made, without regard to the source from which the fund or property came, upon the direct, personal, pecuniary obligation of that company to its subcontractors, and in reduction of that acknowledged liability between debtor and creditor. The first effect of these payments was to reduce the personal and primary liability of the payor. The second and indirect effect was to relieve the property of the railroad company, in so far as such payments, on proper application, might discharge the independent liens of the subcontractors. If the subcontractor took pay in bonds at an agreed value, instead of money, it ought not to operate as a discharge of his lien to any greater extent than a like payment in money. If we are right in holding that a partial payment in money by the contract company, upon its own absolute obligation, would not operate to defeat or release the direct lien of the subcontractor to a ratable proportion of the common security for any balance left unpaid, then it must follow, in the absence of an agree-

ment to the contrary, that it is immaterial whether such payment was made in bonds or money, and immaterial to inquire as to the origin of the contract company's title. The decree declaring the liability of the railroad company proceeded upon the basis we have indicated, and meets our approval.

4. The next objection to the decree presented by the Central Trust Company is as to the method adopted for the ascertainment of the contract price agreed to be paid by the railroad company to the contract company. Appellants insist that it was the duty of the railroad company to withhold the payment of any part of the contract price until all the work contracted for by the principal contractor or by subcontractors had been finished, and all liens ascertained and perfected; that at that time only the contract price should have been ascertained, and distributed among all the persons entitled to share therein. This suggestion is based upon the peculiar facts of this case. The contract price was payable in bonds and shares of stock, and not in money. As between the principal contractor and the railroad company, the latter was obliged to pay this contract price only in bonds and stock. It was also obligated to make these payments on estimates, as the work progressed. This the railroad company did, and paid to the contract company, from time to time, as the work progressed, every dollar that it was obligated to pay. These bonds were converted into money by the contract company, as received, and the proceeds of such sales were the principal source from which the contract company made its partial payments to its subcontractors. The price of these bonds varied. Those first delivered are shown to have sold as high as 90 cents on the dollar, but from that time they declined in market value. Some were sold for 60 cents, some for 40 cents, some for 30 cents; and after a receiver was appointed in this case, and these mechanics' liens asserted, the market value of the bonds had declined to from 12 to 17 cents on the dollar. Now the contention of the trust company is that the money value of the price to be paid by the railroad company should have been ascertained when the work was finally completed or abandoned. This contention would operate to reduce the money value of its contract to a comparatively insignificant sum. The position is inequitable, unjust, and legally unsound. The railroad company had placed itself in a position where it was obligated to pay out these securities to the contract company from time to time. The statute, as we have before said, placed it under the obligation to see that the contract price was ratably distributed among all persons who contributed to the building of the railroad, or the furnishing of materials. If its own contract was inconsistent with its protection against the independent liens of subcontractors, undischarged by a proper application of the contract price by the contractor in discharge of subcontractors' claims, it did not operate to destroy the contract, or to suspend its liability thereunder. It is perhaps true that it might have resorted to a court of equity, and have brought the contractor and subcontractors before the court, and compelled a distribution of the contract price ratably among all the lienholders, or have obtained other equitable interference, by way of an injunction prohibit-

ing the contract company from subletting any of its work unless it should give a bond for the protection of the owner against subcontractors and their liens. If the railroad company chose not to avail itself of possible equitable assistance, it had the right to go ahead, and pay the contract price into the hands of the contractor, as it had agreed to do, and take the risk of liability to subcontractors whose claims should be left unpaid. Now, this is exactly what the railroad company did. If the contract price had been payable in money, instead of bonds and stocks, no such question as this would have been material, but inasmuch as the subcontractors' lien is an independent one, and inasmuch as their contracts with the principal contractor were for money, it follows that the subcontractors' liens operated as a security for the payment of the money; and it is no answer for the railroad company to say that it contracted to pay for the building of its road in land or bonds or shares, and therefore their lien is dischargeable by land or bonds or shares. That would be so if the subcontractors' liens were by way of subrogation. It would be so if the subcontractors were limited to the amount due by the owner to the contractor at the time their liens were acquired. But the lien of the subcontractor, being an independent, direct lien, is a lien for the security of the money due on his contract with the principal contractor. It therefore becomes essential that the money value of the contract price to be paid by the owner shall be ascertained. The subcontractor is bound by that contract price, for the statute provides that the aggregate amount of the liens shall not exceed the original contract price. The method adopted by the circuit court was to ascertain the market value of the bonds and shares at the time they were actually delivered by the railroad company to the contract company in pursuance of the contract between them. That method, we think, was the proper one, and did no injustice to any of the parties concerned.

The insistence of the appellees below, and again presented by their several cross appeals, was, that the contract price was $50,000 per lineal mile, plus the various county aid bonds. This contention rests upon the assumption that for the construction of the railroad, and for the other expenditures to be made by the contract company, it agreed to pay $50,000 per lineal mile, in money, or, at its election, in its bonds and shares. This assumption is radically erroneous. The contract fixed no money value whatever. It provided that "in payment for this work thus to be done, and the expenditures to be made, the railroad company agrees to assign and deliver to the contract company the following named securities, to wit." This is followed by a detailed statement of the securities to be delivered in payment. By the third paragraph it was provided that payment should be made in monthly installments, as the work progressed. By the fourth paragraph the railroad company agreed to deposit these securities, as soon as practicable, with the Louisville Safety-Vault Company, as trustee under this agreement. The fifth paragraph provides the method of ascertaining, from time to time, the payments due to the contract company, by prescribing that the chief engineer should, from month to month, certify in writing "what proportion the work

done, and material furnished, bore to the total expenditures and cost of the railroad and equipments, when completed according to this contract, as same may be estimated by said engineer, and the amount payable on account thereof to said contract company, and thereupon the amount so certified shall become immediately payable by the railroad company to the contract company." The sixth paragraph, which gave to the company an option to pay in money, was in these words:

"Paragraph 6. As the several installments of money shall become due to the contract company under this agreement as above provided, it shall be the duty of the railroad company to pay the same in money, or to give to the trustee an order for a delivery to the contract company, or its order, of the securities deposited with it as above provided, equal in amount, at their par value, to the amount of such installment, as fixed by the certificate of the engineer. If the railroad company should pay any such installments in money, it may, upon depositing with the trustee the receipt of the contract company therefor, withdraw from the hands of the trustee an equal amount, at par, of the bonds and capital stock of the railroad company, such withdrawal to be in equal proportion of each. If payment be made in securities, instead of money, the contract company shall be entitled to receive pro rata payments in the stocks and bonds of the railroad company, after deducting the amounts paid in county bonds, as provided in clause first of paragraph II. of this contract."

It is difficult to draw an inference that the company was to pay at the rate of $50,000 per mile in the event it elected to pay in money, in place of securities. The estimates of the engineer were to be based on the proportion of the work done to the whole amount to be done. Thus, if the estimates showed that 10 per cent. of the whole work had been done and materials furnished, then 10 per cent. of the securities had been earned, and were deliverable. It is not within the bounds of reason that these securities were estimated at their par value, or that if, for any reason, the company had refused to deliver them, a money judgment equal to the par of the stocks and bonds would have been recoverable. But, however this may be, the railroad company did deliver these stocks and bonds as they were earned; and this, as we have already seen, it had a right to do. The legal proposition that where a promise is in the alternative, to pay in money or in property, the promisor has an election either to pay in money or the equivalent, and that, if he fail to pay in property on the day of payment, the right of election is gone, and the promisee entitled to payment in money, is not applicable, upon the facts of this case. To be applicable, there must be a promise to pay a definite sum of money, or its equivalent in property, and there must be a failure to pay according to the contract. Neither essential is found here. No contractual relation existed between the railroad company and the subcontractors. It was under no promise to pay them anything. It is true that they had a direct, statutory lien to secure them in the payment by the contractor of the sums due under their several subcontracts, and it is also true that they have been allowed money decrees against an owner who had a contract to pay only in property. But this is because the property has been paid over to the principal contractor, thus entitling them to a decree for a proportionate part of the value of the property. That value

was properly ascertained when the master reported its cash value when paid and delivered to the contract company. The amount to be paid in bonds and stocks for each lineal mile was manifestly not intended as the measure of a money price to be paid, or of a money indebtedness in case of a default in the delivery of the securities. The price to be paid for the work was fixed with reference to the speculative value of the securities in which it was to be paid, and it would be most gross injustice to hold that a price so payable furnished the measure of a money indebtedness. In Railroad Co. v. Kelley, 5 Ohio St. 180, the agreement was that 75 per cent. of the price of construction should be paid in money, and 25 per cent. in the stock of the company. The railroad company made default in delivery of the stock, and was held to have lost the right to pay in stock. But upon a full consideration of the contract the Ohio court held that the price was a stock price, and not a money price, and the price, as payable in stock, was not, in the contemplation of the parties, a money indebtedness, and that it would be a manifest injustice to give the contractors, in cash, what was measured by payment in speculative stock. The court thereupon held that the market value of the stock was the measure of recovery. The cases of Moore v. Railroad Co., 12 Barb. 156, and Parks v. Marshall, 10 Ind. 21, are to the same effect.

5. Appellants' tenth assignment of error is based upon the action of the court in overruling its twenty-ninth exception to the report of Special Master Du Relle. That exception was in these words:

"Because the master valued $652,000 of bonds issued by the Richmond, Nicholasville, Irvine & Beattyville Railroad Company, and afterwards indorsed by the Louisville, New Albany & Chicago Railway Company, at 90 cents on the dollar, being the amount at which they sold after such indorsement, instead of valuing the said bonds at the sum they were worth at the time they were received by the Ohio Valley Improvement & Contract Company without said indorsement."

The contract company entered into an agreement with the Louisville, New Albany & Chicago Railway Company, a corporation of Indiana, by which the latter, in consideration of the transfer to it of a controlling interest in the stock of the Richmond, Nicholasville, Irvine & Beattyville Railroad Company, agreed to indorse the bonds of the latter company, when delivered to the contract company. The latter company is not shown to have had anything to do with this arrangement, the consideration for the indorsement proceeding wholly from the contract company. Bonds to the amount of several hundred thousand dollars were accordingly indorsed and sold before any question was made as to the validity of the indorsement. The master, in ascertaining the value of the contract price to be paid for construction, attached no value to the stock of the railroad company, except in so far as that stock had been used to enhance the value of the bonds, as furnishing a consideration inducing the Indiana Railroad Company to indorse the bonds of the Kentucky Railroad Company. We are unable to see any injustice in this. While the stock had no definite market value in money, yet a controlling interest did have value sufficient to procure an indorsement on the bonds in

which the remainder of the price of construction was to be paid. If that indorsement enhanced the market value of those bonds, that enhancement furnished a reasonably fair measure of the value of the shares which were part of the contract price. Before all the bonds had been indorsed, and before most of them indorsed had been sold, the act of the Indiana Railroad Company in undertaking to indorse the bonds of another railroad corporation was, in a judicial proceeding instituted by the Indiana Company against the contract company and other holders of indorsed bonds, declared null and void as ultra vires. This decision operated to deprive the contract company of any benefit from such indorsement on unsold bonds, but it did not rob it of the benefit already realized through the enhanced value of such bonds as had been sold theretofore. To the extent of this benefit, it had been able to realize value from the shares of stock, and this enhanced value of the bonds actually sold was a fair measure of the value of that part of the price of construction paid in shares. Costs of appeal will be paid out of the fund arising from the sale of the railroad.