NORDSTROM et al. v. SIVERTSEN–JOHNSEN MINING & DREDGING CO. et al. JORGENSEN v. HAGER et al. IVERSEN v. SIVERTSEN–JOHNSEN MINING & DREDGING CO. et al.

Nos. 2565, 2567, 2568.

(Second Division. Nome. February 27, 1915.)

1. MINES AND MINERALS ⊕112(1)—LIENS OF MECHANICS—CONSTRUCTION OF STATUTES.

The act of the Legislature of Alaska approved April 30, 1913, entitled "An act to create, establish and provide for liens on mines," etc. (Sess. Laws 1913, p. 308), contains provisions in addition to and qualifying some of those in a prior act of Congress establishing mechanics' and miners' liens on mining claims and the product thereof in Alaska. *Held*, the territorial act should not be treated as an independent act. It is one relating to the same subject-matter as that legislated upon by Congress as found in section 691 et seq., Comp. Laws Alaska 1913, and the congressional and territorial legislation thereto must be treated as one harmonious whole.

---

⊕See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. MINES AND MINERALS &⟶112(1)—LIENS OF MECHANICS—CONSTRUCTION OF STATUTES.

The act passed by Congress relating to miners' liens in Alaska, as modified by the act of the Legislature of the territory, being in pari materia, are to be construed together, and, if possible, made to harmonize as one body of law.

3. STATUTES &⟶109—TITLE OF ACT.

Although a territorial act may authorize many things of a diverse nature to be done, the title will be sufficient if the things authorized may be fairly regarded as in furtherance of the subject expressed in the title. It is therefore to be liberally construed and treated, so as to uphold the law if possible.

4. MINES AND MINERALS &⟶112(3)—LIEN OF MECHANICS—PROPERTY SUBJECT TO.

Under the act of the Legislature of Alaska approved April 30, 1913, a miner may have a lien upon gold dust extracted from a mine, and upon a mine itself, for labor performed in extracting the product from the mine, but not on a dredger used in the work of extracting the gold dust.

5. MINES AND MINERALS &⟶112(3)—LIEN OF MECHANICS—PROPERTY SUBJECT TO.

A mechanic's lien on the mining claim and the product thereof extracted by the labor of the mechanic or miner cannot extend to or attach to the gold dust or mineral that shall have been extracted from the mine prior to the attaching of the lien.

6. MINES AND MINERALS &⟶112(1)—LIEN OF MECHANICS—CONSTITUTIONALITY.

The miners' lien laws passed by Congress and the Legislature of Alaska are held to be constitutional, and within the power of Congress and the territorial Legislature, respectively.

The three above-entitled causes constitute three actions for the recovery of money due for services alleged to have been rendered by the plaintiffs to the defendants in connection with certain mining operations, and the plaintiffs seek to establish and enforce a laborer's lien under the existing lien law of Alaska, as provided by sections 691–704, inclusive, Comp. Laws Alaska 1913, and chapter 79, Sess. Laws Alaska 1913, the title to which last reads as follows: "An act to create, establish and provide for liens on mines in favor of laborers and materialmen, and" to repeal "all acts and parts of acts in conflict therewith." Upon the threshold of these cases, some of the defendants interpose their demurrers, by which

&⟶See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

they object to the enforcement of the laborers' liens against the property sought to be made the subject thereof, on the ground that the law enacted by the territorial Legislature (Sess. Acts 1913, p. 308) fails to provide for the filing of a notice of lien and no mode of procedure for enforcing the lien, and that the law is in other respects void and unconstitutional.

G. B. Grigsby, of Juneau, and T. M. Reed, of Nome, for plaintiffs.

J. F. Hobbes, O. D. Cochran and G. J. Lomen, all of Nome, for defendants.

TUCKER, District Judge.    The territorial act of 1913 should not be treated as an independent act of a territorial Legislature.    It is an act relating to the same subject-matter as that legislated upon by Congress, as found in section 691 et seq., Comp. Laws Alaska 1913, and the congressional and territorial legislation with reference thereto must be treated as one harmonious whole.    It is no objection to the validity of the territorial act of 1913 that it does not amend or refer specifically to the former act of Congress on the subject of mechanics' or laborers' liens.    That is generally done, and is probably essential whenever the body of an act is subsequently amended in some particular language or other particular; but the territorial act does not propose to do this.    It simply enlarges the scope of the former law with reference to the mechanics' and laborers' lien by placing the ordinary laborer on an equal footing with the laborer for the improvement of mines.    The act of Congress as contained in section 691 et seq. and the territorial act of 1913 stand in relation the one to the other as two state statutes or congressional acts passed at different times or sessions, which, being in pari materia, are to be construed together, and, if possible, made to harmonize. The law of the territory of Alaska since 1912 traces its authority to both congressional and territorial legislation.    By act of Congress passed August 24, 1912 (37 Stat. 512, c. 387), Alaska had conferred upon it legislative powers by providing for a legislative assembly, and as a territory of the United States, which it then became, it is subject to the authority of Congress, and statutes in force therein, as enacted either by Congress itself or by the representative body upon which

Congress has conferred legislative authority.   36 Cyc. 943; Lindley on Mines, § 64.

It is true that the territorial act of 1913 does not provide any procedure for enforcing the lien, nor for filing the lien notice; and it may be conceded, as found in the authorities, that the notice of the lien is the foundation of the action; but, if the above views and conclusions with reference to treating the congressional act and the legislative act on the subject of mechanics' and laborers' liens together, and the status of the legislative power in Alaska is as stated—and we think there can be no doubt about either—there seems to be no reason why the claimant of the lien should not be allowed to file his notice of lien as provided by section 695, Comp. Laws Alaska 1913, and proceed to enforce it under section 699 thereof, which provides that:

"Actions to enforce the liens created by this Code shall be brought before the district court, and the pleadings, processes, practice, and other proceedings shall be the same as in other cases."

Mr. Black, in his very able work on the Interpretation of Laws, in discussing the effect of "harmonizing the laws," says:

"A legislative act is always to be considered with reference to the pre-existing body of the law, to which it is added, and of which it is henceforth to form a part."   Black on the Interpretation of Laws, p. 60 et seq.; also pages 211, 212.

The next principal objection to enforcing the liens in these cases is that the territorial act of 1913 is repugnant to section 8 of the organic act, which is as follows:

"No law shall embrace more than one subject which shall be expressed in its title."   U. S. Comp. St. 1916, § 3535.

This inhibition on the legislative power is found in the Constitution of nearly all the states, and has been frequently subjected to the investigation and construction of the courts of last resort.   After most diligent examination of the decisions, I find the most satisfactory statement of the law with respect to this restrictive provision to be contained in the case of Commonwealth v. Brown, 91 Va. 762, 21 S. E. 357, 28 L. R. A. 110.   In that case, Judge Reily, rendering the opinion, said:

"The provision of the Constitution is a wise and wholesome one. Its purpose is apparent. It was to prevent the members of the Legislature and the people from being misled by the title of the law. It was intended to prevent the use of deceptive titles as a cover for vicious legislation, to prevent the practice of bringing together into one bill for corrupt purposes subjects diverse and dissimilar in their nature, and having no necessary connection with each other, and to prevent surprise or fraud in legislation by means of provisions in bills of which the titles gave no intimation. And, on the other hand, it was not intended to obstruct honest legislation or to prevent the incorporation into a single act of the entire statutory law upon one general subject. It was not designed to embarrass legislation by compelling the multiplication of laws by the passage of separate acts on a single general subject. Although the act or statute authorizes many things of a diverse nature to be done, the title will be sufficient if the things authorized may be fairly regarded as in furtherance of the object expressed in the title. It is therefore to be liberally construed and treated, so as to uphold the law if practicable. Cooley on Constitutional Limitations, p. 175. All that is required by the constitutional provision is that the subjects embraced in the statute, but not specified in the title, are congruous, and have a natural connection with, or are germane to, the subject expressed in the title. This has been, so far as I am aware, the construction given this provision of the Constitution by this court, by the highest courts of other states whose Constitutions contain the same or a similar provision, and by the Supreme Court of the United States."

I have quoted from this opinion thus extensively because, prior to his election to the Supreme Court of Virginia, the judge rendering it was one of the codifiers of the laws of Virginia, and was noted for the exhaustive investigation he gave to all questions coming before him for decision. In conformity to the above views and authorities, and the well-settled rule that a statute may be valid in part and invalid in part (see Black on Interpretation of Laws, p. 96 et seq. and notes), it is now my duty to determine the validity of the respective liens sought to be enforced by the plaintiffs in the three above-entitled causes.

In the first case, supra, it is sought to enforce the lien against a quantity of gold dust held by the United States marshal under the process of attachment in the suits of Albert Meyer & Co., etc., v. Sivertsen-Johnsen Mining & Dredging Company, No. 2550, and Solomon River Dredging Company, etc., and Seward Dredging Co., etc., v. Same Defendant. If the plaintiffs prove affirmatively and to the satisfaction of this court that the gold dust was extracted from the

mining ground of the defendants by any process of mining operation whatsoever at any time after the lien has attached, whenever that may be, under the terms of the statute, then it is subject to the laborers' lien in favor of the plaintiffs; otherwise, it is not, and the attachments stand.

The title of the territorial act of 1913 provides for a laborers' lien upon mines, and the body of the act gives a lien upon the mine and upon the gold dust extracted therefrom. Any excavation in the earth is a mine, and the dirt and mineral contained therein are a part and parcel of the mine and are embraced in the title of the act, so long as they remain a part and parcel of the mine.

Bouvier's Law Dict. vol. 2, p. 413, defines a mine as follows:

"An excavation in the earth for the purpose of obtaining minerals."

The laborer's lien, however, cannot extend or attach to the gold dust or mineral that shall have been extracted from the mine or ground prior to the attaching of the lien, for then it is not any part or parcel of the mine itself, and is not embraced in the title of the act. After the gold dust has been extracted from the mine, and before the lien attaches, it is only the product thereof or personal property—wholly disconnected from the mine.

In the second case, the plaintiffs seek to enforce a laborer's lien against a mining claim. In Bouvier's Law Dict. vol. 2, p. 415, we find the following definition thereof:

"A mining claim is a parcel of land containing precious metal in its soil or rock."

Judge Hillyer defined a "mining claim" to be that portion of the public mineral lands which the miner for mining purposes takes up and holds in accordance with the mining laws. 2 Lindley on Mines (3d Ed.) § 327.

From the foregoing definitions, and the consideration of the nature of a mining claim, it may be fairly held to be embraced within the title of the act, and is subject to a lien, provided, of course, that the lien notice has been properly filed and the other provisions of the act complied with.

In the third case, supra, the plaintiffs seek to enforce a laborers' lien against a dredge. A dredge is merely an article of machinery, or a machine used in the operation of mines or

mining for extracting gold and other minerals from the ground or real estate. It is in no sense a part or parcel of the mine or mining ground, but is detached therefrom, and capable of being moved from place to place, either in its set-up or taken-down condition, whenever it is desirable or convenient for dredging purposes, and this is frequently and actually done. As property, it is in the same class with threshing machinery, or any other kinds of farming machinery, being used upon or in connection with mines or mining ground. It is purely and essentially movable personal property, in no way a part of the mine, which necessarily conveys the idea of an excavation in the earth for the purpose of obtaining minerals, and, from its inherent nature, it is clearly not embraced within the title of the act, and therefore cannot be subjected to a laborer's lien under the act in question.

Having disposed of the objections to the act, that it embraces more than one subject, which is not expressed in the title, and that the act is abortive, in that it fails to provide for its enforcement, or for the filing of notice of the lien, there still remain two other specific objections raised by the demurrers:

(1) That the act grants special and exclusive privileges, contrary to section 416 of the Compiled Laws; and

(2) That the act is unconstitutional, in that it is repugnant to the "due process" clause of the Constitution of the United States and on other constitutional grounds. These objections are directed to the congressional act of 1900 contained in the Compiled Laws, as well as to the territorial act of 1913, and it may not be amiss to note that the congressional act was approved by the joint committee on territories of the House and Senate, composed presumably of some lawyers, assisted by three lawyer compilers from the states of New York, Virginia, and Michigan. This to some extent speaks in favor of its validity. The judge of this court may be pardoned for saying that he knows the chairman of the House committee and the assistant compiler from Virginia. The former was a graduate from the law school of the University of Virginia; and both he and the assistant compiler stand well in the profession in Virginia.

Section 416 of the Compiled Laws forbids the granting by the Legislature to any corporation, association, or individual

any special or exclusive privileges; but it is too patent for discussion that this clause has not the faintest application to the questions involved here. In any event, I apprehend that it is wholly met and disposed of generally by the decision in the case of Jones v. Great Southern Fireproof Hotel Company, 86 Fed. 370, 30 C. C. A. 108, to which reference will hereafter be made, and in which is elaborately discussed the question of the validity of the lien laws generally.

In Am. & Eng. Encyc. of Laws (2d Ed.) vol. 20, pp. 444, 445, 446, and 447, there are collected in note 5, page 444 et seq., and note 1, page 446 et seq., a vast number of cases on this subject, those upholding the validity of direct or absolute liens in favor of laborers and mechanics, and those denying their validity, the former largely outnumbering the latter. Some cases of the latter class have been cited in the brief of counsel, and I have read some of both classes and given them my best consideration; but it does seem to me that the decision in the case of Jones v. Great Southern Fireproof Hotel Company, supra, reversing the same case reported in 79 Fed. 477, and cited in note 1, page 446, Am. & Eng. Encyc. of Law, as contrary to the decisions denying the validity of these laws, disposes of the whole question. It may be worthy of notice that the case in 86 Fed. 370, 30 C. C. A. 108, was decided as late as 1898; that it was heard by Taft and Lurton, Circuit Judges, and Clark, District Judge, and the opinion rendered by Lurton, who was afterwards, in 1909, appointed by President Taft Associate Justice of the Supreme Court of the United States, from which it may be fairly conceded that the decision is of unusual value and authority as a judicial utterance. To avoid making this opinion too long, and as the opinion in Jones v. Southern Fireproof Hotel Company, supra, is itself quite lengthy, I shall content myself with only a few scattered excerpts from the last-named case in support of the validity of these lien laws; but I commend the entire decision to the careful consideration of counsel in this case, who have twice argued to the contrary so earnestly and ably. It contains an exhaustive review of the decisions of the various state and federal courts, and appears to me to go to the very root of all the constitutional objections raised by counsel for the defendants.

At page 379 of 86 Fed., at page 117 of 30 C. C. A., the court said:

"In a large number of the cases the question of the constitutionality of acts extending the lien to subcontractors and others having no direct contractual relation with the owner has been brought in question, and the validity of the legislation upheld."

At page 383 of 86 Fed., at page 121 of 30 C. C. A., after citing numerous cases from state courts, the court said:

"The direct question as to the constitutionality of acts extending a lien to subcontractors and materialmen furnishing materials at the instance of contractors has not arisen in the Supreme Court of the United States, nor in any of the United States Courts of Appeals, so far as we have been able to discover. An act of Congress of March 2, 1833 (4 Stat. 659), gave a lien in the District of Columbia upon buildings to all who do work or furnish materials on order of the contractor, who should give notice to the owner within 30 days after being employed to do the work or furnish materials that they claimed such lien. In Winder v. Caldwell, 14 How. 434 [14 L. Ed. 487], this act was construed as not giving a lien to the principal contractor. The court said: 'The contractor, though mentioned in the act, is not enumerated among those entitled to its benefits. The aim and policy of this statute is also obvious. Experience has shown that mechanics and tradesmen, who furnish labor and materials for the construction of buildings, are often defrauded by insolvent owners and dishonest contractors. Many build houses on speculation, and, after the labor of the mechanic and the materials are incorporated into them, the owner becomes insolvent and sells the buildings, or incumbers them with liens; and thus one portion of his creditors are paid at the expense of the labor and property of others. Or the insolvent owner, who builds by the agency of a contractor or middleman, pays his price and receives his building, without troubling himself to inquire what has been the fate of those whose labor or means have constructed it. These evils require a remedy, and such a one as is given by this act. Its object is not to secure contractors, who can take care of themselves, but those who may suffer loss by confiding in them. It is not the merit of the contractor that gave rise to the system, but the protection of those who might be wronged by him, if the owner were not thus compelled to take care of their interests before he pays away the price stipulated. The contractor is neither within the letter nor the spirit of the act.'"

At page 384 of 86 Fed., at page 122 of 30 C. C. A., the court said:

"In Central Trust Co. of New York v. Richmond, N. I. & B. R. Co., 31 U. S. App. 675–688, 15 C. C. A. 273, 68 Fed. 90 [41 L. R. A. 458], we enforced a lien in favor of such subcontractors arising under a

Kentucky statute.    Touching the origin and nature of the lien, we said: 'It is not a lien originating in a contract for a lien, but arises out of the statute independent of any agreement for a lien, and is based upon the equity of paying for work done or materials delivered.' "

Again, at page 384 of 86 Fed., at page 122 of 30 C. C. A., the court, referring to the cases just above mentioned by it, said:

"In neither of these cases, though the amounts involved were great, was any constitutional objection to the statutes giving the lien suggested, though very eminent counsel appeared in each case.    The constitutional validity of statutes giving an independent lien has the support of most of the text-writers.    2 Jones, Liens, 286;    Phil. Mech. Liens, § 30;  Boisot, Mech. Liens, §§ 22, 23.    Overton on Liens (section 553) has been cited as advancing a contrary view.    If we had doubt as to whether such statute was 'due process of law,' or violated the fundamental right of owning and enjoying property, or unreasonably restrained liberty of contract, we should be disposed to yield to the current and weight of authority upholding such acts as valid and constitutional.    No court is justified in striking down an act of legislation, unless it is clearly satisfied that the act is in conflict with the organic law limiting the power of the legislative branch of government.    Such statutes have met with the approval of the legislative bodies of nearly every state in the Union, as well as of Congress, as indicated by the act of 1833, construed in Winder. v. Caldwell, 14 How. 434 [14 L. Ed. 487].    They have survived assault whenever the question has arisen, save in Ohio and Michigan, and to a limited degree in Pennsylvania, and in a still larger number of instances have been enforced without question as to their validity.

"But the validity of such statutes need not be rested upon mere authority.    They find sanction in the dictates of natural justice, and most often administer an equity which has recognition under every system of law.    That principle is that every one who, by his labor or materials, has contributed to the preservation or enhancement of the property of another, thereby acquires a right to compensation. This strong natural justice has given rise to a variety of liens recognized by the common law.    Thus, without any agreement, the common law gave to one who, by his labor or expense, has made, preserved, enlarged, or repaired a chattel, a lien thereon for his security, which he may, however, lose if he surrender possession.    So we find another illustration in the lien given one who, in the exercise of a quasi public employment, is required to receive or perform some service in respect to the thing upon which the lien is given.    That the owner who sells his chattel shall not be required to part with it until the price is paid rests upon the justice of the matter, and not upon any agreement.    But the remedies prescribed by the common law by no means embrace the numberless instances in which the

inherent right of the matter requires that a charge or lien should be recognized as arising out of the [inherent] nature of the transaction, independently of any agreement. That wide class of trusts arising out of the conduct of the parties, either with or without intention, but without express words of creation, which we call constructive or implied trusts, rests upon the natural justice which will not permit one to retain that which in justice does not belong to him, and therefore fastens upon the thing, or that into which it is traced, a charge or lien in favor of the equitable owner. So the vendor of realty may ordinarily, without any express agreement, apply the property sold to the payment of the price. There are a large variety of cases where a lien has been recognized as arising out of the nature of the transaction, although there was no direct contractual relation between the parties affected. Thus, in the maritime law the last lien·created by the master of a ship for supplies or repairs is entitled to preference over prior liens; the principle being that the common pledge has thereby been preserved for the common benefit. So he who rescues goods from capture or the perils of the sea has a lien thereon for his compensation. The meritorious character of a claim often displaces prior burdens, as in the case of supplies and labor furnished a mortgaged railway company to keep it in operation, and preserve the property for the benefit of all interested."

Nothing can add to the force and lucidity of this opinion, and its exhaustive review of the cases. For these reasons, and for the reason that these plaintiffs are in any event entitled to a personal judgment, when they shall have proved the services alleged to have been rendered, the demurrer in each of the above cases is overruled.