### JONES et al. v. GREAT SOUTHERN FIREPROOF HOTEL CO.

### SOSMAN et al. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. April 5, 1898.)

Nos. 535 and 536.

1. FEDERAL COURTS—BINDING EFFECT OF STATE DECISIONS.
    The decision of the highest court of a state passing upon the validity of a state statute under the state constitution is not binding upon the federal courts when thereby the validity of a contract, executed before there was a judicial construction of the statute, between the citizen of the state and the citizen of another state, is affected.

2. CONSTITUTIONAL LAW—LEGALITY OF LIEN OF SUBCONTRACTOR.
    Rev. St. Ohio, § 3184, as amended by Act April 13, 1894, giving subcontractors a lien on the building and land for the amount of their services or materials, without regard to the amount still unpaid the principal contractor by the owner, limited only by the original contract price to be paid by the owner, is not unconstitutional, under the Ohio bill of rights, as a restraint upon the freedom of contracts. 79 Fed. 477, reversed.

Appeals from the Circuit Court of the United States for the Eastern Division of the Southern District of Ohio.

This is a bill to enforce the statutory lien given to persons who do labor or furnish materials for the construction or repair of any house or other building by section 3184, Rev. St. Ohio, as amended by the act of April 13, 1894. By sec-

tion 3184 it is provided that "a person who performs labor, or furnishes machinery or material for constructing, altering or repairing" any house or other structure mentioned in the section, "by virtue of a contract with or at the instance of the owner thereof, or his agent, trustee, contractor or sub-contractor, shall have a lien to secure the payment of the same," upon the structure, "and upon the interest, leasehold or otherwise, of the owner in the lot or land on which the same may stand." Section 3185 provides that the lien shall be claimed and recorded within four months from the time of furnishing such labor or material, and that the lien shall operate from the date of the first item in the account. Section 3185a is as follows: "In all cases where the labor, material or machinery referred to in sections 3184 and 3185 shall be furnished by any person other than the original contractor with such owner or his agent or trustee, the lien shall not exceed the actual value of the labor, material or machinery so furnished, and the aggregate amount of liens for which the property may be held shall not, in the absence of fraud or collusion between the owner and original contractor, exceed the amount of the price agreed upon between the owner and original contractor for the performing of such labor and the furnishing of such material and machinery: provided, if it shall be made to appear that the owner and contractor, for the purpose of defrauding sub-contractors, material-men or laborers, fixed an unreasonably low price in the original contract for any work or material for which a lien is given under section 3184, the court shall ascertain the difference between such fraudulent contract price and a fair and reasonable price therefor, and sub-contractors, material-men and laborers shall have a lien to the amount of such fair and reasonable price so ascertained."

The complainants are members of a firm doing business at Pittsburg, Pa., and are citizens of Pennsylvania. The defendants are the Great Southern Fireproof Hotel Company, a corporation of the state of Ohio, against whom the lien is asserted, and William J. McClain, a citizen of Ohio and the contractor to whom materials were sold for use in the hotel building constructed by him at Columbus, Ohio, for the Great Southern Fireproof Hotel Company. The other defendants are corporations, firms, and individuals, claiming liens of various kinds upon the same property. They are all citizens of states other than Pennsylvania. The bill in substance avers that the defendant McClain entered into a contract with the Great Southern Fireproof Hotel Company to construct and complete at Columbus, Ohio, a six-story fireproof hotel and opera house, for the sum of $345,000; that complainants contracted on the 13th of December, 1894, to furnish to said McClain, for use in said building, some 900 tons of structural steel; that, under said agreement, they delivered, between April 16, 1895, and January 24, 1896, such steel, to the value of $43,296.74, which steel so furnished was all used in the construction of said house. They further aver that a balance of $11,410.02 is due and unpaid, and that, within four months after said steel was delivered, they filed and recorded their lien as required by section 3185, Rev. St. Ohio. There is no averment that the hotel company is indebted to said McClain, or that it was indebted when the lien was filed. Neither is it averred that said hotel company had any notice of any such contract between complainants and McClain, nor promised to pay for same, nor that any contractual relations whatever existed between it and complainants. The hotel company demurred to the bill for want of equity. This demurrer was sustained, and the bill dismissed by Judge Sage, whose opinion is reported in 79 Fed. 477.

T. P. Linn, for appellants Jones and others.
George N. Nash, for appellants Sosman and Landis.
John J. Stoddart and J. E. Sater, for appellee.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The decision must turn here upon the constitutionality of the Ohio statute giving to subcontractors, laborers, and material men a lien upon the building and property of the owner, for labor or materials fur-

nished at the instance of the principal contractor. So much of the statute as gives a lien to complainants as subcontractors has been declared by the supreme court of Ohio to be null and void, as in conflict with the Ohio bill of rights, which, among other things, declares that the right of "acquiring, enjoying, and possessing property" is inalienable. That decision was made in a suit to which complainants were not parties, and after their rights under the law had accrued and their claim of lien recorded, as required by the statute. Young v. Hardware Co., 55 Ohio St. 423, 45 N. E. 313. Does that decision furnish a rule of decision which is obligatory upon courts of the United States? When a citizen of one state enters into a contract with a citizen of another, he acquires the constitutional right to have that contract interpreted and enforced by a court of the United States. That right does not by any means involve the application of a different rule of decision, for the judiciary act requires that the laws of the several states shall be regarded as rules of decision, in trials at common law, where they apply. But even the decision of the highest courts of the state, by whose law the rights of the parties are to be ascertained and enforced, does not, under all circumstances, furnish a rule of decision obligatory upon courts of the United States. The question is, when do they apply? In the past this inquiry has involved no little friction between the courts of the Union and those of the states. But the final arbiter of all such constitutional questions is the supreme court of the United States. So far as the inquiry is pertinent to the decision which must be here made, that court has in an authoritative way decided:

1. That such decisions are not necessarily obligatory upon courts of the United States where they affect contracts which were valid under the constitution and laws of the state, as interpreted and enforced by its highest judicial tribunals at the time they were entered upon. Rowan v. Runnels, 5 How. 134; Trust Co. v. Debolt, 16 How. 432; Gelpcke v. City of Dubuque, 1 Wall. 175; Olcott v. Supervisors, 16 Wall. 678; Taylor v. Ypsilanti, 105 U. S. 60; Douglass v. Pike Co., 101 U. S. 677; Louisville Trust Co. v. City of Cincinnati, 47 U. S. App. 36–46, 22 C. C. A. 534, and 76 Fed. 296.

In Rowan v. Runnels, supra, Chief Justice Taney said:

"Undoubtedly, this court will always feel itself bound to respect the decisions of the state courts, and, from the time they were made, regard them as conclusive in all cases upon the construction of their own laws. But we ought not to give them a retroactive effect, and allow them to render invalid contracts entered into with citizens of other states, which, in the judgment of this court, were lawfully made."

In Douglass v. Pike Co., cited above, the court, after reviewing the preceding cases, decided by that court, said:

"The true rule is to give a change of judicial construction in respect to a statute the same effect in its operation on contracts and existing contract rights that would be given to a legislative amendment; that is to say, make it prospective, but not retroactive. After a statute has been settled by judicial construction, the construction becomes, so far as contract rights acquired under it are concerned, as much a part of the statute as the text itself, and a change of decision is, to all intents and purposes, the same in its effect on contracts as an amendment of the law by means of a legislative enactment."

2. Neither are such decisions obligatory upon courts of the United States when thereby the validity of contracts between a citizen of the state and a citizen of another state is affected, which were executed before there was any judicial construction of the statute or constitution which seemed to authorize the contract in question. Burgess v. Seligman, 107 U. S. 20–33, 2 Sup. Ct. 10; Pleasant Tp. v. Ætna Life Ins. Co., 138 U. S. 67–72, 11 Sup. Ct. 215; Louisville Trust Co. v. City of Cincinnati, 47 U. S. App. 36–47, 22 C. C. A. 534, and 76 Fed. 296.

In Louisville Trust Co. v. City of Cincinnati, supra, this court, after stating the general rule to be that a court of the United States would adopt and follow the construction of a state statute announced by the highest court of the state, said:

"A well-grounded exception exists where contracts and obligations have been entered upon before there has been any judicial construction of the statutes upon which the contract or obligation depends by the highest court of the state whose statute is involved. In such a case, if a court of the United States obtains jurisdiction of a question touching the validity, effect, or obligation of such a contract, it will, while 'leaning to an agreement with the state court,' exercise an independent judgment as to the validity and meaning of such contract, although the meaning and validity of state statutes may be an element in the case, and will not be bound to follow opinions of the state court construing such statute if such decisions were rendered after the rights involved in the controversy originated."

In Burgess v. Seligman, cited above, the court declined to follow the supreme court of Missouri in respect to the interpretation of a statute of that state, the decision having been made after the transaction in controversy had arisen. Justice Bradley, in that case, speaking for a unanimous court, said:

"We do not consider ourselves bound to follow the decision of the state court in this case. When the transaction in controversy occurred, and when the case was under the consideration of the circuit court, no construction of the statute had been given by the state tribunals contrary to that given by the circuit court. The federal courts have an independent jurisdiction in the administration of state laws, co-ordinate with, and not subordinate to, that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that, by the course of their decisions, certain rules are established which become rules of property and action in the state, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state constitutions and statutes. Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But, where the law has not been thus settled, it is the right and duty of the federal courts to exercise their own judgment, as they also always do in reference to the doctrines of commercial law and general jurisprudence. So, when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision, of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued. But even in such cases, for the sake of harmony and to avoid confusion, the federal courts will lean towards an agreement of views with the state courts if the question seems to them balanced with doubt. Acting on these principles, founded, as they are, on comity

and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the state courts. As, however, the very object of giving to the national courts jurisdiction to administer the laws of the states in controversies between citizens of different states was to institute independent tribunals, which it might be supposed would be unaffected by local prejudices and sectional views, it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication. As this matter has received our special consideration, we have endeavored thus briefly to state our views with distinctness, in order to obviate any misapprehensions that may arise from language and expressions used in previous decisions. The principal cases bearing upon the subject are referred to in the note, but it is not deemed necessary to discuss them in detail."

This case does not fall under the first class of exceptions stated above. The Ohio mechanic's lien statutes, prior to the amendment of April 13, 1894, only gave a lien to creditors of the principal contractor for labor or materials furnished at his instance, upon such balance as was due from the owner to the contractor when notice was given of the claim to a lien. Such statutes are in the nature of mere garnishee proceedings, whereby the creditors of the contractor are substituted to the lien of the contractor. Copeland v. Manton, 22 Ohio St. 398; Dunn v. Rankin, 27 Ohio St. 132; Bullock v. Horn, 44 Ohio St. 420, 7 N. E. 737; Stark v. Simmons, 54 Ohio St. 435, 43 N. E. 999. The last case cited was one in which the owner was permitted to set off his debt to the contractor by a claim he held against him when the contract was made, and thus defeated the effort of laborers to assert a lien against the owner.

The cases of Railway Co. v. Cronin, 38 Ohio St. 122, and Railway Co. v. McCoy, 42 Ohio St. 251, were suits under a statute giving liens to those contributing labor or materials to the construction of a railway. It does not appear that the principal contractor had been paid, and no constitutional objection to the law was urged or decided.

Smith v. Parsons, 1 Ohio, 236, and Weil v. State, 46 Ohio St. 450, 21 N. E. 643, presented no question as to any mechanic's or other lien statute, and the opinions are mere applications of the rule that contracts are made upon the basis of the existing law, and that a statute which operated only upon future contracts was therefore not legislation impairing the obligation of contracts. While these decisions have a bearing upon the general question of the legislative power to impress a lien upon the property of an owner in favor of those having no direct contractual relation with him, yet they do not constitute judicial decisions directly bearing upon the law with reference to which complainants may be said to have contracted. There has therefore been no such change of opinion by the supreme court of Ohio as to bring into operation the rule that the rights of the parties are to be determined according to the law as it had been judicially declared when the contract was made.

This brings us to the question as to whether the Ohio legislature exceeded its constitutional powers in providing that subcontractors and material men should have a lien, limited in extent by the original contract price to be paid the contractor, upon the building and land of the owner, to secure them for labor and materials furnished at the instance of the contractor. The facts of this case are such as to en-

title the complainants to demand from this court an independent judgment and expression of opinion as to the validity of the Ohio statute under which their transactions were had, and under which they claim a lien. With every disposition to come to an agreement with the views of the supreme court of Ohio, in the interest of harmony of decision, we are nevertheless compelled to express our inability to assent to the conclusions of that learned and impartial tribunal as to the validity of the legislation under which complainants' rights are claimed. The decision of that court was not placed upon any merely local or peculiar provision of the constitution of Ohio. The ground upon which they placed their objection to the law was that it was an unreasonable and oppressive restraint upon the owner's liberty of contract.

"The owner," said the Ohio court, "has the right to acquire his building upon the best terms possible, and if he can, by making a contract to pay in advance, or by exchange of securities or other property, acquire his building cheaper than by contracting to pay after four months from its completion, he has the inalienable right to so acquire it, and to be protected in its enjoyment; and it is not within the power of the general assembly to compel him to pay a higher price for his building, for the protection of laborers and furnishers with whom he has no contractual relations. To enable the contractor, by force of this statute, to enlarge the price to be paid by allowing liens to be taken on the property for labor and materials, would be as unjust as to authorize the owner, by statute, to enlarge the building, without a corresponding increase in payment." 55 Ohio St. 423–442, 45 N. E. 315.

In answer to the argument that the contract was made with the statute before him, and thereby made the law a part of the contract itself, and consented that those who furnished labor or materials to the contractor for his use would have a lien, the court said:

"This begs the question, and assumes the constitutionality of the statute. If the statute is valid, it must be read into the contract; but, if invalid, it binds neither party, and does not become a part of the contract."

This restraint upon an owner's liberty of contract, the learned court said, was prohibited by those declarations of the Ohio bill of rights which declare that among the inalienable rights of man is "the right of enjoying and defending his life and liberty, acquiring, possessing, and defending property, and seeking and obtaining happiness." Touching the fundamental rights thus enumerated and their application to the law under consideration, the court said:

"It is worthy of notice that the constitution is established to secure the blessings of freedom, and to promote the common welfare. As the constitution must be regarded as consistent with itself throughout, it must be presumed that the laws to be passed by the general assembly, under the powers conferred by that instrument, are to be such as shall secure the blessings of freedom, and promote our common welfare. To make this more emphatic, the first section of the bill of rights provides that 'all men are, by nature, free and independent, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and seeking and obtaining happiness and safety.' And by the second section it is provided that 'all political power is inherent in the people. Government is instituted for their equal protection and benefit.' The usual and most frequent means of acquiring property is by contract, and one of the most valuable and sacred rights is the right to make and enforce contracts. The obligation of a contract when made and entered into, cannot be impaired by act of the general assembly. Article 2, § 28. The word 'liberty,' as used in the first section of the bill of rights, does

not mean a mere freedom from physical restraint or state of slavery, but is deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. People v. Marx, 99 N. Y. 377, 2 N. E. 29; Bertholf v. O'Reilly, 74 N. Y. 509; In re Jacobs, 98 N. Y. 98. Contracts and compacts have been entered into between men, tribes, and nations during all time, from the earliest dawn of history; and the right and liberty of contract is one of the inalienable rights of man, fully secured and protected by our constitution, and it may be restrained only in so far as it is necessary for the common welfare and the equal protection and benefit of the people. That such restraint of the right and liberty of contract is for the common public welfare, and equal protection and benefit of the people, must appear, not only to the general assembly, by force of popular clamor or the pressure of the lobby, but also to the courts; and it must be so clear that a court of justice, in the calm deliberation of its judgment, may be able to see that such restraint is for the common welfare and equal protection and benefit of the people. People v. Gillson, 109 N. Y. 389, 17 N. E. 343. The statute in restraint of the liberty to contract as to interest on money is valid for the reason that all can see that it is for the common welfare. Many other like cases of restraint as to contracts are to be found in our statutes, but all of them, in so far as they are valid, depend for their validity upon the same principle. It was the infringement of the liberty of contract that induced this court, in State v. Lake Erie Iron Co., unreported [no opinion filed], to hold the statute unconstitutional which required corporations to pay their employés at least twice in each month. Our exemption laws can be sustained only on the ground that, while they in a slight degree limit the liberty of contract, such limitation is for the general welfare of the whole people, and does not interfere with their equal protection and benefit. In such cases courts can see that the slight restraint of the liberty of contract is for the common welfare of the people, but no court can see that it is for the common public welfare that the liberty of contract should be taken away from the owner of a building, to enable the seller of materials to collect their value from a man who never purchased them, and has already fully paid the one with whom he contracted for all that he has received. There can be no public necessity for making the contractor the agent of the owner, to enable the seller of materials to collect his pay from one who does not owe him, and with whom he has no contract."

We have made these copious extracts from the opinion for the purpose of indicating that the case did not turn upon any constitutional principle peculiar to Ohio. The "rights" supposed to be violated are rights deemed fundamental under all forms of popular and constitutional government, and like declarations are to be found in all or most of our state constitutions. The question is therefore one of general law, having as much reference to the constitution of any other state as to that of Ohio.

In the case of Whiting v. Railroad Co., 25 Wis. 188, it was held that, under the constitution of Wisconsin, a tax could not be constitutionally laid in aid of the building of a railroad. The supreme court of the United States refused to follow this as a decision obligatory upon it in a case involving the validity of an act of the Wisconsin legislature authorizing a tax in aid of a railroad.

Upon the question as to whether the decision was one of local or general law, the court, in Olcott v. Supervisors, 16 Wall. 678–690, said:

"This was a determination of no local question, or question of statutory or constitutional construction. It was not decided that the legislature had not general legislative power, or that it might not impose or authorize the imposition of taxes for any public use. Now, whether a use is public or private is not a question of constitutional construction. It is a question of general law. It has

a, much reference to the constitution of any other state as it has to the state of Wisconsin.   Its solution must be sought, not in the decisions of any single state tribunal, but in general principles common to all courts.   The nature of taxation, what uses are public, and what are private, and the extent of unrestricted legislative power, are matters which, like questions of commercial law, no state can conclusively determine for us.   This consideration alone satisfies our minds that Whiting v. Railroad Co. furnishes no rule which should control our judgment, though the case is undoubtedly entitled to great respect."

In support of the conclusion reached by the Ohio court, there have been cited but two cases,—Spry Lumber Co. v. Sault Sav. Bank Loan & Trust Co., 77 Mich. 199, 43 N. W. 778, and Waters v. Wolf, 162 Pa. St. 153, 29 Atl. 646.   The Michigan case cited involved the validity of the Michigan Act No. 270 (Laws 1887).   The act was held void. The second section of that act provided that the lien given to sub-contractors or material men should "not be defeated by any contract, agreement, or understanding between the owner, part owner, or lessee of the real estate upon which such improvements are made, or for which such materials are furnished, and the original or any sub-contractor, by any payment made by such owner, part owner or lessee to such contractor or sub-contractor for the contract price of such labor or material, or any part thereof."   The court said such a law "strikes at the foundations of all property in land.   There is no constitutional way for devesting a man's title except by his own act or default.   Here his own act is not required, and his freedom from default is no defense. He may pay in full, in advance, or otherwise, for all he has contracted for.   He may contract for a house built in a certain way, and of certain materials, and may have to pay for what he never bargained for, and what his building contractor had no right to put off upon him. The original contract plays no part in the matter, except as a fact which binds no one, and has no significance.   Such a gross perversion of all the essential rights of property is so plain that no explanation can make it plainer."   The case cites no authorities, and states no particular provision of the constitution of Michigan which was violated.

The state of the decisions in Pennsylvania is quite peculiar.   Under the mechanic's lien act of 1803 and 1806 it was held that the owner of any interest in the land upon which the improvement was placed could, by his contract, bind the land in its entirety.   Savoy v. Jones, 2 Rawle, 343.   In the case cited, Gibson, C. J., thus stated the ground upon which such a result was to be justified:

"The object of the legislature was to enable the mechanic or material man to follow his labor or material into the building, which is pledged for the price, without regard to the estate of the owner.   Did the lien proceed from a contract with the owner, the argument drawn from the apparent injustice of permitting a tenant for life to affect the estate of the remainder-man, who was not a party, would not be destitute of plausibility.   But there is no real injustice in the matter, the owners of the several parts of the fee being proportionately benefited; and it is consequently just that the whole should bear the burden."

By the later acts of 1836 and 1845 it was provided that a lien should exist in favor of all debts contracted by the owner or contractor for labor or materials.   This legislation was upheld upon the theory that the contractor was, by implication, made the agent of the owner

to fasten a lien upon the building and the owner's land for debts contracted for labor and materials. Harlan v. Rand, 27 Pa. St. 511; Singerly v. Doerr, 62 Pa. St. 9; Duff v. Hoffman, 63 Pa. St. 191.

Adhering to this idea of an implied agency of the contractor for the owner, it was held in Schroeder v. Galland, 134 Pa. St. 277, 19 Atl. 632, that a subcontractor or material man could have no right against the owner not founded on the contract between the owner and his contractor; that the agency of the owner was special and limited by his contract, of which all who give him credit must take notice; and that, if he contracted that neither himself nor any other should have a lien, none could be claimed by subcontractors or others.

In Taylor v. Murphey, 148 Pa. St. 337, 23 Atl. 1134, it was held that a stipulation by the contractor that he "will release and discharge the said houses from the operation of all liens," etc., was not a waiver of the right to enter a lien, or a covenant that none should be entered, but only a personal undertaking on the part of the contractor to settle any liens that might be filed before demanding payment of the balance due upon his contract, and that, therefore, subcontractors had acquired valid liens. To meet the ruling in Schroeder v. Galland and cases following it, the act of 1891 was passed. That act provided that the owner should make no contract with the contractor which should operate to defeat the rights of subcontractors and material men to file liens, and that all subcontractors should have a lien notwithstanding any stipulation to the contrary in the contract between the contractor and owner unless consented to in writing by such subcontractors.

In Waters v. Wolf, 162 Pa. St. 153, 29 Atl. 646, a lien was asserted by a subcontractor who had not consented to a stipulation by which the contractor was to neither have nor create any lien in favor of others. The court, in an elaborate opinion, held the act of 1891 invalid, as an unauthorized restraint upon the right of "acquiring, possessing, and protecting property," and not within the delegated powers of the legislature.

The Ohio act involved here contains no provision expressly prohibiting an agreement limiting the supposed agency of the contractor for the owner, or restraining him from creating any lien, such as was contained in both the Michigan and Pennsylvania statutes. If such acts are properly to be regarded as constituting the contractor a special agent for the owner, to which he consents by making a contract with the law before him, it would seem that the Ohio act would be valid, there being no inhibition of an agreement withholding such power, and no intimation that the hotel company, in this instance, limited the implied agency of the contractor. Certainly, the Pennsylvania decisions give no support to the decision of the Ohio court that the Ohio act is void. Under the settled line of decisions in Pennsylvania, the Ohio act is valid. In the last Pennsylvania case, that of Waters v. Wolf, cited above, the court announces its adherence to the long line of decisions upholding just such a statute as the Ohio act involved here, saying:

"In the absence of an express contract against liens, with a statute before him giving a lien to those with whom he contracted, the consent of the owner

that a remedy given by law should be enforced under the contract was certainly to be implied."

In all or nearly all of the states there are statutes intended to give liens to those who contribute labor or materials to the enhancement or improvement of the land or buildings of an owner. These statutes vary in their character and purpose. Originally, they were chiefly acts giving a lien to persons having direct contractual relations with the owner. Such statutes did not protect those who contributed to the improvement through dealings with the contractor, and were soon followed by statutes extending the lien to persons not contractually connected with the owner, but who furnished labor or materials for the building through contracts with the principal contractor. This was accomplished in two ways: (1) By giving to creditors of the contractor a derivative lien, whereby they were substituted to the rights of the contractor as they existed when notice was given of the claim. Such statutes were in the nature of mere garnishee or attachment proceedings, and were subject to no criticism as doing injustice to the owner. Payment in advance was a defense under all such statutes, for the contractor's creditors could stand in no better situation than he did. So, if he had no lien, his creditors had none, as their utmost right was to be substituted to the contractor's place. (2) Or by statutes which gave to those who furnished such labor or materials to the contractor a direct or independent lien upon the building and land of the owner. Under these, payments to the contractor prior to expiration of the time within which notice might be given were ineffectual, the lien not being a derivative one, but independent of that given the contractor. Some of these statutes sought to diminish the severity of this legislation by limiting the aggregate of such liens to the original contract price, or by providing for a contractor's bond for the benefit of the owner with summary remedy thereon, or by both. The verbiage of statutes of the latter class varies. In some the contractor is declared to be the agent of the owner, and, as such, authorized to obtain labor and materials upon the credit of the owner or his building and land, or both.

In a large number of cases the question of the constitutionality of acts extending the lien to subcontractors and others having no direct contractual relation with the owner has been brought in question, and the validity of the legislation upheld. In still other instances such acts have been enforced without question as to their constitutionality. We cite a number of cases, though by no means all, in which acts involving questions identical with those raised by the Ohio statute have been enforced, either after their validity had been challenged or sub silentio.

In New York the constitutionality of an act like the Ohio act was twice raised, and twice decided favorably to the lien. Blauvelt v. Woodworth, 31 N. Y. 285; Glacius v. Black, 67 N. Y. 563.

In Blauvelt v. Woodworth, supra, payments made to the contractor in advance of the time within which liens might be filed were held to have been made at the peril of the owner, and a sale of the premises by the owner, after the completion of the building, but before notice, and within the time within which notice might be given, were held in-

effectual to defeat the lien of the material men. Touching the constitutionality of a law which brought about such consequences, the court said:

"There is no provision of the constitution which precludes the legislature from declaring a statutory lien, in respect to future contracts, in favor of either the contractor, the subcontractor, or the laborer, upon the land of the owner, at whose instance and for whose benefit the services are performed. The act of 1852 was in force when the contract in question was made; and every contract is presumed to be executed with reference to existing laws, and subject to such modification, in respect to the remedies of the parties, as may result from subsequent legislation, if free from constitutional objection."

And in Glacius v. Black, supra, the constitutional objection was again urged. The court said:

"The constitutionality of the legislation known as 'Mechanic's Lien Laws' was affirmed in Blauvelt v. Woodworth, and the court held that there was no constitutional objection to the creation, by the legislature, of statutory liens, in favor of mechanics and others, for the purposes and under the circumstances and limitations specified in these statutes. Laws of similar character have been in force in this state for more than forty years (Laws 1844, c. 220); and similar legislation is found on the statute books of many of the states. These statutes have been frequently under consideration by the courts, and, so far as we know, their constitutional validity has never been judicially questioned."

In Minnesota similar statutory liens have been enforced. O'Neil v. St. Olaf's School, 26 Minn. 329, 4 N. W. 47; Bohn v. McCarthy, 29 Minn. 23, 11 N. W. 127; Laird v. Moonan, 32 Minn. 358, 20 N. W. 354. In the case last cited, the constitutionality of the law was elaborately considered by the court. Among other things, the court said:

"As such liens are incumbrances upon the owner's title, they can only be created by his consent or authority; and it is upon this ground that such legislation is supported. The statute annexes the lien as an incident to the contract of the owner with the contractor or builder, and such contract is the evidence of the authority of the latter to charge the building and land with liabilities incurred by him in performing his contract." "The owner consents to this power conclusively and irrevocably, so far as others than the builder are concerned, by making a contract while such is the law."

That liens for an amount in excess of the contract price of the improvements or building might be asserted, was held to be no objection. On this subject the court said:

"As respects the amount which may thus be secured, their rights are not dependent upon or limited by the amount due the contractor from the owner under the original contract, nor by the state of the accounts between them. It is sufficient that the liens are created through the owner's contract, from which his consent is implied. To avoid the incumbrance of such liens, the owner takes the burden of securing the bond which he is authorized by the act to take. Whether the burden of taking such proceedings for his own protection should thus be cast on him, or whether subcontractors and laborers should be left to proceed against the amount due, as under the former practice, was entirely a question of legislative policy. And this is sufficient to dispose of the objection that the law unreasonably limits the exercise of the owner's discretion as to the persons whom he shall contract with; that is to say, to such as can give bonds or are financially responsible for the contracts they may make in the prosecution of the work. It is strictly in conformity with the policy which allows a lien in any case. It does not take away or affect the rights of the owner any further than it may be necessary for the security of those who are presumed to have added something to the owner's property equal to the expenses incurred. Spofford v. True, 33 Me. 283; Taggard v. Buckmore, 42 Me. 77. It is ordinarily understood from the nature of the case that under building contracts the work is not to be

done wholly by the contractor: and it is a sound and just principle that all those who have, by consent of the owner, or in pursuance of contracts with him for that purpose, contributed to increase the value of his property, should have an interest in it until their respective claims for such services have been discharged."

In Wisconsin such an act was sustained over an earnest dissent by Judge Cassady.    Mallory v. Abattoir Co., 80 Wis. 170, 49 N. W. 1071.

In Missouri the case of Henry v. Rice, 18 Mo. App. Rep'r 497, was overruled, and the validity of the act sustained, in an able opinion by Judge Barclay.    Henry v. Evans, 97 Mo. 47, 10 S. W. 868.

In Massachusetts an act which did not expressly extend the lien to subcontractors or workmen was held to give a lien upon an implied agency of the contractor.    In Parker v. Bell, 7 Gray, 429, the court construed an act which provided that "any person who shall actually perform labor in erecting, altering or repairing any building or structure upon real estate, or shall furnish materials actually used for the same, by virtue of any agreement with or consent of the owner thereof, or other person having authority or acting for such owner to procure labor or furnish materials in his behalf, shall have a lien upon such building or structure, and upon the interest of the owner of the building or structure in the lot of land upon which the same is situated, to secure the payment of the amount due him for such labor and materials," and gave to a plasterer employed by a subcontractor an independent lien, the court saying:

"That the employment of a principal contractor to build a dwelling house for a definite and fixed compensation operated to authorize the latter to do all acts necessary and proper to enable him to fulfill his contract, and to complete the tenement to be erected.    It was, of course, understood between the parties that this work was not to be wholly and in every part done by the contractors with their own hands.    They were fully empowered to employ, in the execution of the contract, the necessary workmen, and to cause their labor to be faithfully applied in fulfillment of its provisions.    The consent of the respondents to such employment of laborers, and such application of their labor, is a necessary and inevitable implication from the contract under which the house was to be erected.    The labor, therefore, which was actually performed by the petitioners, in doing the plaster and stucco work of the house, and which was a necessary part of the construction, having been rendered by virtue of an agreement with Whittemore & Currier, must be considered to have been performed with the consent of the respondents.    It was done for their benefit, and under stipulations into which they had entered, by force of which they were entitled to insist that the contract should be fully performed."

In Donahy v. Clapp, 12 Cush. 440, Shaw, C. J., for the court, said, concerning the theory upon which the subcontractor might acquire a lien upon the land of the owner:

"Such liens in favor of subcontractors would equally bind the estate by consent of the owner; because such a contract, by force of the existing law, when it was made, of which the owner is presumed to be conusant, gives his irrevocable power to his contractor, to charge and bind his estate; and, when such power is executed by the actual making of such subcontract for labor, it is in law the act of the owner, hypothecating his own estate to the extent of the price of such labor."

In Bowen v. Phinney, 162 Mass. 593, 39 N. E. 283, Holmes, J., said:

"Our statute gives an immediate lien to one who has performed labor in the repair of a building by the consent of the owner.    Even if he is employed by a contractor, the laborer's lien is not by way of subrogation, and does not depend

upon the terms of the contract or the state of the account between his employer and the owner of the land."

In Tennessee just such an act was upheld, though most vigorously assailed as beyond the legislative power. In answer to some of the objections urged, Justice Caldwell, in Manufacturing Co. v. Falls, 90 Tenn. 466, 16 S. W. 1045, said:

"It is true that a lien is provided for persons with whom the owner is supposed to have no direct contractual relations, but that fact alone does not invalidate the act; for the owner must be held to a knowledge of the existing law on the subject, and to the presumption that he employed the original contractor, and gave out his work with reference to that law. The right of lien to subcontractors and material men is, by operation of law, incorporated into and made a part of the owner's contract, as much as if expressly included and written therein. He contracts about a subject in which the law declares certain advantages to all persons concerned, whether by direct contract with him or by the employment of his contractor. The law declares that a lien shall exist in favor of the subcontractor and material man in certain contingencies; hence the owner who makes the contemplated contract cannot justly complain of the legal result, especially when he derives the benefit of the labor and material of those for whom the lien is provided, and who often have no other means of compensation. The enforcement of this law does not necessarily result in loss to the owner, nor take from him something for nothing."

In Colter v. Frese, 45 Ind. 96, the validity of such an act was most learnedly vindicated by Judge Warren, who delivered the unanimous opinion of the court.

Stewart v. Wright, 52 Iowa, 335, has been referred to as questioning the validity of such legislation. The case does not so decide. It turned upon the construction of the act which the court interpreted as giving a lien only upon the balance due from the owner when notice of the subcontractor's lien was filed. The judge, writing the opinion, does intimate a doubt as to the power of the legislature to subject the owner to debts of a contractor who had been paid in full before notice. But no such question was involved or decided.

The California act of March 30, 1868, gave to material men and laborers a lien upon a building to secure the amounts due them, "whether done or furnished at the instance of the owner of the building, or other improvement, or his agent; and every contractor, subcontractor, architect, builder, or other person having charge of any mining, or of the construction, alteration, or repair, either in whole or in part, of any building or other improvement, as aforesaid, shall be held to be the agent of the owner for the purposes of this act."

In Hicks v. Murray, 43 Cal. 515, the constitutionality of this act was assailed, but the court, in an opinion of a few lines, said they thought the act was constitutional.

In the subsequent case of Renton v. Conley, 49 Cal. 185, the court construed the act as limiting the lien to the amount due from the owner to the contractor under the contract at the time notice of the filing of the lien was given the owner, but no constitutional question was raised or decided.

In Maine, like statutes, giving liens to subcontractors and material men who gave notice within the time fixed by the statute, have been enforced, and their constitutionality maintained, upon the ground that they applied only to future contracts, and that all building contracts

were made subject to the provisions of the statute.    Spofford v. True, 33 Me. 283; Atwood v. Williams, 40 Me. 409; Taggard v. Buckmore, 42 Me. 77.    In Atwood v. Williams, supra, the lien of the material man was enforced, although the owner had made full payment to the contractor after the completion of the building, and before notice of the claim to a lien was filed.

In Gurney v. Walsham, 16 R. I. 699, 19 Atl. 323, the constitutionality of such an act was affirmed, upon the ground that the contract was made and entered into subject to its provisions.    The defense that the owner had paid all that he owed the contractor before notice of claim of lien by material men was not sustained.

In Virginia similar acts have been held valid (Improvement Co. v. Karn, 80 Va. 589; Railroad Co. v. Howison, 81 Va. 125); so, in Washington (Lumber Co. v. McChesnay, 1 Wash. 609, 21 Pac. 198); and in Connecticut (Paine v. Tillinghort, 52 Conn. 532); and in Maryland (Treusch v. Shryock, 51 Md. 162).

The direct question as to the constitutionality of acts extending a lien to subcontractors and material men furnishing materials at the instance of contractors has not arisen in the supreme court of the United States, nor in any of the United States courts of appeals, so far as we have been able to discover.    An act of congress of March 2, 1833 (4 Stat. 659), gave a lien in the District of Columbia upon buildings to all who do work or furnish materials on order of the contractor, who should give notice to the owner within 30 days after being employed to do the work or furnish materials that they claimed such lien. In Winder v. Caldwell, 14 How. 434, this act was construed as not giving a lien to the principal contractor.    The court said:

"The contractor, though mentioned in the act, is not enumerated among those entitled to its benefit.    The aim and policy of this statute is also obvious.    Experience has shown that mechanics and tradesmen, who furnish labor and materials for the construction of buildings, are often defrauded by insolvent owners and dishonest contractors.    Many build houses on speculation, and, after the labor of the mechanic and the materials are incorporated into them, the owner becomes insolvent, and sells the buildings, or incumbers them with liens; and thus one portion of his creditors are paid at the expense of the labor and property of others.    Or, the insolvent owner, who builds by the agency of a contractor or middleman, pays his price and receives his building, without troubling himself to inquire what has been the fate of those whose labor or means have constructed it.    These evils required a remedy, and such a one as is given by this act.    Its object is not to secure contractors, who can take care of themselves, but those who may suffer loss by confiding in them.    It is not the merit of the contractor that gave rise to the system, but the protection of those who might be wronged by him, if the owner were not compelled thus to take care of their interests before he pays away the price stipulated.    But the contractor is neither within the letter nor the spirit of the act."

In Grant v. Strong, 18 Wall. 623, and McMurray v. Brown, 91 U. S. 258, and Van Stone v. Manufacturing Co., 142 U. S. 128, 12 Sup. Ct. 181, the question of waiver of the lien given under various state statutes was considered.    In considering the character and nature of the lien, the court, in McMurray v. Brown, 91 U. S. 258–266, said:

"Liens of the kind, except where the statute otherwise provides, arise by operation of law, independent of the express terms of the contract, in case the stipulated labor is performed or the promised materials are furnished; the principle being that the parties are supposed to contract on the basis that, if the

stipulated labor is performed, or the promised materials are furnished, the laborer or material man is entitled to the lien which the law affords, provided he gives the required notice within the specified time."

In Van Stone v. Manufacturing Co., 142 U. S. 128–136, 12 Sup. Ct. 181, it was said:

"It is not the contract for erecting or repairing the building which creates the lien, but it is the use of the materials furnished and the work and labor expended by the contractor, whereby the building becomes a part of the freehold, that gives the material man and laborer his lien under the statute. The lien is brought into operation by virtue of the statute, and the contract for building is entered into presumably in view of, or with reference to, the statute."

In Trust Co. v. Condon, 31 U. S. App. 387–422, 14 C. C. A. 314, and 67 Fed. 84, a lien in favor of subcontractors was enforced against mortgagees by this court. Judge Taft, in delivering the opinion of the court touching the character of the lien, said:

"A subcontractor's lien under the statute is not dependent on the principal contractor's having perfected his lien. Green v. Williams, 92 Tenn. 220, 21 S. W. 520. It is independent of and superior to his lien, and is only limited by the amount due to the principal contractor at the time of the service of notice by the subcontractor on the railroad company. Therefore the assignee of a principal contractor's lien is junior to the subcontractor who has perfected his statutory lien."

In Central Trust Co. of New York v. Richmond, N., I. & B. R. Co., 31 U. S. App. 675–688, 15 C. C. A. 273, and 68 Fed. 90, we enforced a lien in favor of such subcontractors arising under a Kentucky statute. Touching the origin and nature of the lien, we said:

"It is not a lien originating in a contract for a lien, but arises out of the statute independent of any agreement for a lien, and is based upon the equity of paying for work done or materials delivered. * * * The clear purpose of the Kentucky statute was to make the liens of the contractor and subcontractor independent, direct liens, the latter limited only by the amount of the original contract price. The lien of the subcontractor does not spring out of the lien of the contractor, and is not derived therefrom or subordinate thereto. The aggregate of all the liens is not to exceed the contract price agreed to be paid by the owner, but this limitation concerns not the fact of a lien, but the extent thereof. Being a direct lien, its existence does not depend upon the existence or nonexistence of a contractor's lien, and the waiver of a lien by a contractor will not affect the subcontractor's lien."

In neither of these cases, though the amounts involved were great, was any constitutional objection to the statutes giving the lien suggested, though very eminent counsel appeared in each case. The constitutional validity of statutes giving an independent lien has the support of most of the text writers. 2 Jones, Liens, 286; Phil. Mech. Liens, § 30; Boisot, Mech. Liens, §§ 22, 23. Overton on Liens (section 553) has been cited as advancing a contrary view. If we had doubt as to whether such statute was "due process of law," or violated the fundamental right of owning and enjoying property, or unreasonably restrained liberty of contract, we should be disposed to yield to the current and weight of authority upholding such acts as valid and constitutional. No court is justified in striking down an act of legislation, unless it is clearly satisfied that the act is in conflict with the organic law limiting the power of the legislative branch of government. Such statutes have met with the approval of the legislative bodies of nearly every state in the Union, as well as of congress, as

indicated by the act of 1833, construed in Winder v. Caldwell, 14 How. 434. They have survived assault whenever the question has arisen, save in Ohio and Michigan, and to a limited degree in Pennsylvania, and in a still larger number of instances have been enforced without question as to their validity.

But the validity of such statutes need not be rested upon mere authority. They find sanction in the dictates of natural justice, and most often administer an equity which has recognition under every system of law. That principle is that every one who, by his labor or materials, has contributed to the preservation or enhancement of the property of another, thereby acquires a right to compensation. This strong natural justice has given rise to a variety of liens recognized by the common law. Thus, without any agreement the common law gave to one who, by his labor or expense, has made, preserved, enlarged, or repaired a chattel, a lien thereon for his security, which he may, however, lose if he surrender possession. So, we find another illustration in the lien given one who, in the exercise of a quasi public employment, is required to receive or perform some service in respect to the thing upon which the lien is given. That the owner who sells his chattel shall not be required to part with it until the price is paid rests upon the justice of the matter, and not upon any agreement. But the remedies prescribed by the common law by no means embrace the numberless instances in which the inherent right of the matter requires that a charge or lien should be recognized as arising out of the nature of the transaction, independently of any agreement. That wide class of trusts arising out of the conduct of the parties, either with or without intention, but without express words of creation, which we call constructive or implied trusts, rest upon the natural justice which will not permit one to retain that which in justice does not belong to him, and therefore fastens upon the thing, or that into which it is traced, a charge or lien in favor of the equitable owner. So, the vendor of realty may ordinarily, without any express agreement, apply the property sold to the payment of the price. There are a large variety of cases where a lien has been recognized as arising out of the nature of the transaction, although there was no direct contractual relation between the parties affected. Thus, in the maritime law the last lien created by the master of a ship for supplies or repairs is entitled to preference over prior liens; the principle being that the common pledge has thereby been preserved for the common benefit. So, he who rescues goods from capture or the perils of the sea has a lien thereon for his compensation. The meritorious character of a claim often displaces prior burdens, as in the case of supplies and labor furnished a mortgaged railway company to keep it in operation, and preserve the property for the benefit of all interested.

Whoever takes and holds possession of land to which another has the better title is liable to the true owner for the rents and profits, and no distinction is recognized between a bona fide and mala fide possession. Green v. Biddle, 8 Wheat. 1, 74. But this was a harsh rule when applied to a case where the rents and profits had been offset by lasting improvements, which had actually increased the value of the land. Courts of equity, therefore, soon applied the principle that,

where the owner resorted to a court of equity for an account of rents and profits, the permanent improvements should offset the liability of the possessor if his possession and improvement were in good faith. 2 Story, Eq. Jur. §§ 799a, 799b, 1237. 1239.

In Bright v. Boyd, 1 Story, 478, Fed. Cas. No. 1,875, and same case in 2 Story, 605, Fed. Cas. No. 1,876, Justice Story laid down the broad doctrine that a bona fide purchaser, without notice of defect in his title, who makes improvements upon the estate, has a lien upon the estate for the increased value, after deducting rents and profits; and a court of equity will enforce this lien against the true owner who recovers the estate at law against such a purchaser. This case has been adopted and approved in Vallés' Heirs v. Fleming's Heirs, 29 Mo. 152, Association v. Morrison, 39 Md. 281, and Hatcher v. Briggs, 6 Or. 31, though it cannot be said to have received any very general support, though often cited. The reason is doubtless found in the fact that the equities of bona fide purchasers of defective titles were so generally recognized as to result in statutes in most of the states, called "betterment" or "occupant" statutes, which provide that a bona fide occupant making lasting improvements in good faith shall have a lien upon the estate recovered by the true owner to the extent that his improvements have increased the value of the land. Though the operation of these statutes is to make the true owner pay for improvements made against his will, and which he might not desire, the courts have sustained their constitutionality, as giving remedy where before there had been none, though a strong equity existed. Cooley, Const. Lim. 486 et seq.; Brown v. Storm, 4 Vt. 37; Ross v. Irving, 14 Ill. 171; Griswold v. Bragg, 48 Fed. 519; Hunt's Lessee v. McMahan, 5 Ohio, 132; Scott v. Mather, 14 Tex. 235; Davis v. Powell, 13 Ohio, 308; McCoy v. Grandy, 3 Ohio. St. 463; Bacon v. Callender, 6 Mass. 303; Welch v. Wodsworth, 30 Conn. 149; Whitney v. Richardson, 31 Vt. 300. The constitutionality of a similar Tennessee act was denied in Nelson v. Allen, 1 Yerg. 376, but Chief Justice Catron, in a note, says the question did not arise.

Not only was the equity so broadly declared and enforced by Justice Story in Bright v. Boyd, supra, recognized and enforced by the civil law, but in that system of law very high consideration was given to all who had, by their contributions, benefited, preserved, or enlarged the estate or property of another; and, among creditors secured by a common pledge or mortgage, those whose contributions were given and used for the benefit of the thing hypothecated were privileged, and, among this class, those whose contributions were last given and used had the preference. Mackeldy, Rom. Law, 280, 281.

Domat says:

"Among creditors who are privileged, it does not matter which of them is first or last in order of time, for they are distinguished only by the nature of their privileges." Domat, Civ. Law (by Strahon) 681.

Thus, he who had sold an immovable thing was privileged for the price, before the creditors of the purchaser and all others, as to the thing sold. So, he who loaned money to a purchaser to pay the purchase price had the same privilege as the seller would have

had till he had been paid. He who loaned money to preserve the thing, or to make an improvement of an estate, had a like privilege. Id. 682, 683. This equity was, by the civil law, extended to all who had contributed to the preservation, repair, enlargement, or creation of an improvement on land. This privilege is thus stated by Domat (page 683, § 1744):

"Architects and other undertakers, workmen and artificers, who bestow their labor on buildings or other works, and who furnish materials, and in general all those who employ their time, their labor, their care, or furnish any materials, whether it be to make a thing, or to repair it, or to preserve it, have the same privilege for their salaries, and for what they furnish, as those who have advanced money for these kinds of works, and which the seller has for the price of the thing sold."

None of these instances, from either the civil or common law, of a charge or preference, are dependent upon an express agreement for such privilege over other creditors. They have their basis in the nature of the transaction. Statutes which give to a contractor or material man, dealing directly with the owner, a lien on the building or land, do so independently of any agreement for a lien, but their validity has never been doubted. Yet the basis for the interposition of a lien is the mere equity in favor of him who, by his labor or materials, has benefited the owner, and has acquired, therefore, an interest in the property benefited, to secure his just compensation. In most instances it is well understood that the contractor will employ others to aid in or do the work and to furnish the materials necessary. The earlier statutes did not extend any protection to those who should be thus employed by the contractor. To remedy this, some statutes gave to such subcontractors, workmen, or furnishers of materials a mere derivative lien, by which they might be substituted to the lien and claim of the contractor. In others, an independent lien was given to all who should, at the instance of the owner or his contractor, contribute towards the completion of the work either labor or materials. Of this character is the Ohio statute under consideration. Such statutes rest upon the principle of natural justice which lies at the foundation of the many liens or preferences among creditors which we have cited from both the common and civil law. It is true that a lien is created in favor of one with whom the owner has no direct contractual relations. But, if the owner makes the contract with the law before him, the law enters into and becomes a part of the contract. The legal effect of the contract is to give a lien to all who, at the instance of his contractor, shall be employed to furnish labor or materials for the work which he has let out. So far as such a statute is limited to future contracts, it cannot be said to impair the obligation of a contract. If the law be subject to no other objections, it impairs no contract, for all thereafter made are entered into upon the basis of the law. "The inhibition of the constitution is wholly prospective. The states may legislate as to contracts thereafter made as they see fit. It is only those in existence when the hostile law is passed that are protected from its effect." Edwards v. Kearney, 96 U. S. 595; Greenwood v. Freight

Co., 105 U. S. 13; Denny v. Bennett, 128 U. S. 489, 9 Sup. Ct. 134; Smith v. Parsons, 1 Ohio, 236; Weil v. State, 46 Ohio St. 450, 21 N. E. 643.    Neither can the owner be said to be thereby deprived of his property without due process of law.    He has voluntarily made a contract with the law before him.    He has thereby subjected his property to liability for certain debts of the contractor. His own voluntary consent is an element in the transaction.    He knows what the law is, and makes a contract under that law.    It is idle to say that under such circumstances he is deprived of his property without due process of law.    Provident Inst. for Savings v. Jersey City, 113 U. S. 506–514, 5 Sup. Ct. 612.

If, then, this statute does not unduly restrain the owner's liberty of contract, considered as an incident to the right of owning, possessing, and enjoying property, the law must be constitutionally unobjectionable.    If, however, this legislation is the mere arbitrary exercise of the powers of government, unauthorized by the established principles of private right, and not having the sanction of natural justice, it is not the law of the land.    But we have already seen that the underlying purpose of the act is not to arbitrarily and unnecessarily oppress the owner in any incident of his right as owner, but to secure those who, by their labor or materials, have contributed to the improvement of the owner's property.    That the liens under consideration are given to secure debts which are primarily the debts of another would be fatal to the legislation, as taking the property of one to pay the debts of another, but for the equity arising from the use of the labor and materials by the owner.    It is in this connection of the owner with such debts that the justice of the statute is found.    In paying off such claims, the owner may, if he exercise proper precaution, pay only his own debt to the contractor.    If he be required to pay such subcontractors when nothing is due the principal contractor, it is his own fault. That the liability of the owner in respect to building contracts is restrained in some degree by this statute must be admitted.    If he pay in advance, or contract to pay in property, or by an exchange of paper, and his contractor be dishonest or insolvent, he may find himself involved by the contractor's debts for labor or supplies. This contingency he may not always be able to guard against.    But as much may be said of those who furnish labor or materials at the instance of the contractor.    Without the lien they must look alone to the contractor, and may not always be able to protect themselves.    Inasmuch as the owner actually gets the benefit of their contributions to his property, their equity is a strong one, and the legislature has, in its discretion, determined to cast upon the owner the responsibility of guarding against the defaults of a contractor selected by himself.    To protect the class having this equity, the making of building contracts has been regulated.    The restraints upon the owner are neither arbitrary nor oppressive; nor are they, under this Ohio statute, any more onerous than required by the necessity of protecting those who actually do the work or furnish the materials by which the owner is benefited.    To permit such persons to follow and recover their contributions in kind would

be futile to them, and disastrous to the owner.    A law which has for its basis equitable principles, which in all times and in all ages have had recognition, cannot be arbitrary and oppressive to the extent of exceeding the boundary of legislative discretion.    Restraints upon liberty of contract are constantly met with in the legislation of every state.    Statutes requiring certain contracts to be in writing or to be witnessed or acknowledged or registered, statutes regulating interest or the time within which rights may be enforced, and statutes exempting property from liability to execution, are notable examples of statutes regulating and limiting contracts.    No more striking example of interference with liberty of contract is afforded than the statute upheld by the Ohio court in Weil v. State, 46 Ohio St. 450, 21 N. E. 643.    The statute there declared valid was one which regulated conditional sales of personal property, or sales upon the installment plan, and made the violation of one of its sections a misdemeanor.

The equity in favor of those to whom the benefit of the Ohio lien law is extended is in its nature comparable to many equities recognized by courts of chancery and in other systems of law. But it was an equity upon which there was no remedy.    The statute gives one in respect to future contracts.    We cannot say that the remedy is so arbitrary or oppressive, or so unreasonable, as to be an act in excess of legislative power.    The right of him who, by his labor and materials, had contributed to the betterment of another's estate, was an imperfect right, because it had not been done at the instance of the owner, though presumably with his knowledge and at the instance of his contractor.    At the common law neither the owner nor his building was chargeable, there being no contractual relation.    The statute recognizes the equity of such contributors, and has turned the imperfect into a perfect right, by prescribing the consequences of a building contract, and giving a remedy to all who, at the instance of the contractor, shall contribute to the performance of his contract with the owner.    That legislation which is sanctioned by the dictates of natural justice can only be avoided by pointing out some specific provision in the organic law which has been violated by its enactment.    Neither upon reason nor authority are we able to come to an agreement with the Ohio court.    In the exercise of our independent constitutional jurisdiction, we must declare our conscientious judgment to be that the Ohio statute was not void, and that complainants are entitled to relief thereunder.    The decree of the circuit court must be reversed. The demurrer will be overruled, and the cause remanded for answer and further proceedings not inconsistent with this opinion.